Lewis C. McCARTY, Jr.

v.

The UNITED STATES.

No. 229–62.

United States Court of Claims.

Feb. 19, 1971.

Stanley Worth, Washington, D.C., attorney of record for plaintiff. Scott P. Crampton, Worth & Crampton, Washington, D.C., of counsel.

David J. Gullen, Washington, D.C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller, and Joseph Kovner, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

SKELTON, Judge:

We are indebted to Trial Commissioner C. Murray Bernhardt in this case for his findings of fact and conclusions of law and also for his opinion in which he held that the plaintiff was entitled to recover and that defendant's counterclaim should be dismissed. We have adopted his findings of fact with minor changes and have reached the same result on questions of law but for different reasons. The opinion of the court follows.

This is an action brought under the provisions of 28 U.S.C. § 1491, and § 2707(a) of the Internal Revenue Code of 1939, reenacted as § 6672 of the 1954 Code,[1] to recover $9,370.14 of penalties paid by plaintiff on account of withholding taxes, including Federal Insurance Contribution Act taxes, due from his principal, Marine Aircraft Corporation (hereinafter "Marine"), for 1952 and through the third quarter of 1953. By counterclaim the Government seeks a judgment for $201,257.70 for the unpaid balance of the penalty assessments against plaintiff for the same period. This figure results from crediting against the $219,678.65 assessed plaintiff the sum of $9,370.14 paid by him and an abatement of $9,050.81, as reported in finding 12.

The facts in this case are as follows: In 1948 plaintiff and one Felio incorporated Marine to exploit certain inventions made by them and to engage in manufacturing and aeronautical engineering. Starting on a modest scale in

---

1. A minor disagreement exists between the parties as to whether the applicable statutory provisions are sections 6671(b) and 6672 of the 1954 Code, as plaintiff avers, or predecessor sections 2707(a), and (d) of the 1939 Code, as defendant states. The language of the respective code provisions is not materially different and, in view of paragraph 1 of the stipulation of the parties on file, the 1939 Code provisions will be employed in this discussion.

New York City with six to eight employees, Marine moved to larger quarters in Texas in 1949 with the cooperation of the Navy. Its business increased rapidly, ultimately involving a total of approximately 29 Navy and Air Force contracts and subcontracts aggregating in excess of $5,000,000, accompanied by an expansion of personnel to a 1952 payroll peak of about 700.

Plaintiff was responsible for obtaining the bulk of Marine's contract work. At the outset he held over 70 percent of Marine's stock. As of late 1952 he and Felio collectively held the majority of Marine's stock. Plaintiff held 40 percent plus of the stock from April through October 1952, and 28 percent plus thereafter through October 1953.

Marine's increased workload was financed by a loan agreement arranged in August 1951 with the Fort Worth National Bank (hereafter "Bank") setting up a revolving credit in the initial amount of $250,000, later increased to $400,000 in February 1952, and to $650,-000 in August 1952. The loan was secured by an assignment of payments under the contracts. Borrowings against the credit were made weekly or whenever Marine needed funds, and were obtained by submission of a certificate of investment disclosing Marine's net investment in contract performance as reduced by progress payments to derive a borrowing base, plus Marine's promissory note if the borrowing base exceeded the outstanding loan balance, subject always to the credit limit. After August 1952 Marine could borrow up to 100 percent of its unreimbursed inventory cost. The Navy guaranteed the loan by a V-loan Guarantee Agreement with the Bank. Through November 11, 1952, payments on the assigned contracts when received by the Bank were applied to the loan balance.

Marine was perennially short of funds to meet its obligations. This condition was brought about by inadequate capitalization, rapid expansion, delays in collections (particularly the standard 15 percent retainages from Government progress payments), and losses under many contracts due to poor cost estimates or poor management, or both. Plaintiff kept close watch over Marine's current and prospective financial status and instructed its treasurer to accord priority to bills for materials and payroll, to the apparent neglect of withholding tax bills, in order that the company could stay in business. By the end of July 1952 Marine owed about $130,000 in withholding taxes, a condition with which all members of its board of directors were not familiar until it was formally disclosed at a board meeting on August 5, and steps then were taken to negotiate a deferred payment arrangement with the Internal Revenue Service (hereafter "Service"). The Navy knew in August 1952 of Marine's tax arrears, and thereafter is charged with such knowledge at all times, even though prior to November 1952 it may not have known specifically of the tax liens filed by the Service.

Those portions of Marine's bylaws which are in the record contain no specific authorization as to payment of bills, including taxes. By resolution of the board of directors company checks required dual signatures from a list of several designated company officials, including plaintiff as president. Plaintiff's authority to pay Marine's bills lost some of its autonomy for practical purposes starting as early as June 9, 1952, when Harry Vollmer was elected as chief executive officer to run the company and set its policy, while plaintiff participated therein but concentrated in the main on production problems and scouting new business. In the next few months plaintiff signed about half of Marine's checks and Vollmer the rest, along with a co-signer's signature in each case. It is reasonable to conclude that the financial condition of Marine was such in this period, and its withholding tax arrears so sizable, that as a practical matter plaintiff would not, after June 9, 1952, have paid the tax arrears on his sole initiative without approval of the board of directors, even though at times there

was enough cash in the till and there was nothing tangible disclosed by the record which would have literally prohibited plaintiff from such payment, except for the pressure of operating expenses. Subsequently, plaintiff's authority to pay Marine's bills on his own initiative was further curtailed and eventually terminated as we shall see.

Marine's general counsel negotiated an agreement with the Service dated October 1, 1952, which, after reciting the tax arrears of approximately $130,000 through July 31, 1952, provided that the tax liens would not be enforced if Marine would pay up the arrears at the rate of $8,000 monthly starting October 1, 1952, and would also meet its current taxes when due. The Service's policy was not to interfere with the war effort by enforcing its tax liens against Marine. Marine's board of directors approved the agreement on October 6, 1952, and plaintiff signed it for the company. A copy of this agreement is attached to defendant's brief. It provided, in pertinent part, in addition to the foregoing, that:

WHEREAS, the notices of Federal Tax liens which are in the process of being filed by the Collector of Internal Revenue in Tarrant County, Texas or elsewhere against Marine * * * will operate against machinery and equipment owned free and clear of any other liens by Marine * * * with an acquisition value after depreciation of $98,000, and a present resale value due to the emergency need for this type of equipment of substantially in excess of that sum,

NOW, THEREFORE, it is agreed by and between the parties hereto as follows:

1. The Collector of Internal Revenue for the Second Texas District shall file notices of tax liens in the proper office in Tarrant County, Texas or elsewhere against Marine * * * covering the full amount of unpaid internal revenue taxes owing from that corporation to the United States Government.

2. The Collector of Internal Revenue * * * so long as the conditions of Paragraph 3 and 4 of this Agreement are adhered to by Marine * * * [i. e., the payment of all current withholding taxes and old age benefit payments plus $8,000 per month on past due taxes plus interest, beginning October 1, 1952], shall refrain from enforcing said federal tax liens by distraint or seizure action, other than as set forth in Paragraph 1 above.

*    *    *    *    *    *

5. In the event that for any reason whatsoever, Marine * * * shall fail to make any of the payments or comply with any of the agreements contained herein, then and in any such event The Collector of Internal Revenue * * * may at his discretion take such steps of distraint or seizure or otherwise as in his judgment he may deem advisable and necessary to protect the interest of the United States Government as outlined herein.

The facts also reflect that the IRS had filed three tax liens on Marine's property through July 25, 1952, all of which except the last had been discharged. It filed eight tax liens thereafter from October 17, 1952, through January 5, 1954. The trial commissioner found that the Fort Worth National Bank, the Federal Reserve Bank of Dallas, and the Navy knew or should have known of these eight tax liens filed by the IRS.

The above described agreement for the payment by Marine of its delinquent taxes was similar to an agreement made in 1951 between Marine and the IRS for the payment of Marine's earlier tax arrears for 1949 and 1950, which was fully carried out.

On the basis of cash forecasts and prospective improvements in production efficiency, Marine's officers responsibly believed that, although its financial situation was serious in 1952, its cash picture would improve each month to enable it to meet the terms of its agreement with the Service and cure its financial situation by late 1953. In view

of Marine's default in deliveries and losses under most of its contracts there was perhaps little reason to be sanguine.

Marine made four payments of $8,000 each from October 1, 1952 to January 2, 1953, against the pre-August 1 tax arrears in accordance with the agreement with the Service, plus a payment of $17,920.84 on October 10, 1952, for September 1952 payroll taxes (August taxes having been paid previously). An additional check in the amount of $23,360 for October 1952 taxes was drawn and dated November 10, 1952, but was withdrawn from the mail at plaintiff's direction when he learned that the Bank would not honor the check despite the fact that a note had been signed at the Bank that morning against the V-loan credit authorization in order to provide funds to cover the check in question, as well as pay other operating expenses.

The reason for the Bank's refusal to honor the November 10 check was that on or about that date the Bank called upon the Navy to take over the unpaid balance (then $629,477.75, plus interest and fees of $1,011.19), which the Navy paid the Bank on November 12, 1952. The principal cause for the Bank's demand for the loan to be taken over by the Navy was that a recent increase in the discount rate by the Federal Reserve Bank (from which commercial banks borrow at favorable rates to loan to customers at a higher rate) had made the loan unprofitable to the Bank, since it had to share the interest income with the Navy in return for the latter's guarantee of payment, as well as to share what small interest was left with the co-lender Bankers Trust Company. Moreover, the Bank was skeptical of Marine's solvency. At that time the loan was not in default and its due date was December 31, 1952.

With the takeover of the V-loan by the Navy, Marine's entire picture was drastically changed to the utmost disadvantage of the company", according to the chairman of its board of directors. Thereafter the loan ceased to function as a normal revolving credit. New credit

was not extended, that is, no further advances were made, but instead funds generated under assigned contracts were released to Marine upon certification of its investment in contracts, similar to the borrowing certificate formula described earlier. Whereas prior to November 12, 1952, Marine did not have to obtain approval of the Bank for withdrawals to pay bills, thereafter Marine had to receive approval by Mr. Stone of the Bank. The Bank in turn had to obtain approval from the Federal Reserve Bank of Dallas, as agent for the Navy. The Bank continued to act as agent for the Navy, through the Federal Reserve Bank of Dallas, in receiving payments under the assignments and administering the loan. The Navy wanted Marine to find another bank to refinance the V-loan, but Marine was unable to do so. From November 12, 1952 through July 1953 sums totaling $1,167,120.77 were released to Marine for payroll and other purposes (including the two $8,000 payments to Internal Revenue for pre-August 1 tax arrears), not counting another $466,492.22 which was retained by the Navy from March through July 1953 and applied against the loan balance.

At the urging of the Navy that it improve its financial position, on December 5, 1952, Marine entered into an agreement with Messrs. Lynch, Flocks, and Gerron whereby, in exchange for a sizable amount of Marine's stock representing payment for the premium, plus enough proxies to control 51 percent of the voting stock, the consortium put up a $1,000,000 bond guaranteeing Marine's performance of the subcontracts with McDonnell and providing assurance to the Martin Company regarding an orderly termination of its subcontracts with Marine. Under that agreement an Executive Committee was formed, composed of plaintiff and Messrs. Vollmer, Lynch, Flocks and Gerron, empowered to make all management decisions for Marine until its McDonnell subcontracts were completed and the performance bond discharged. Pursuant to the agreement Gerron was appointed comptroller

of the company on December 13, 1952, with "full authority in the allocation of funds, the handling of accounts receivable and payable, *countersigning all checks* and, with the approval of the executive committee, [he] will handle all financial transactions." (Emphasis supplied.) In the view of a responsible Navy official who testified, the execution of the performance bond on December 23, 1952, gave the Navy's loan "a new lease on life", which probably accounts for the fact that no contract payments were withheld and applied to the overdue note until March 6, 1953, in order to facilitate the completion of the McDonnell subcontracts which by March 1954 provided funds to completely pay off the loan.

Following Gerron's appointment as Marine's comptroller on December 13, 1952, the Navy regarded him thereafter as Marine's spokesman and duly authorized official who supervised the release of funds from the Navy on a need basis for payrolls, suppliers, and general administrative expenses. Clearly after December 13, 1952, plaintiff had no effective authority to pay bills such as Marine's withholding and F.I.C.A. taxes, for Gerron held the veto power.

Beyond this there is little present relevancy to Marine's Chapter X bankruptcy reorganization in August 1953, a claim filed therein by the Internal Revenue Service aggregating $247,216.49 for taxes and interest, and Marine's ultimate bankruptcy in March 1954. At no time during this period did plaintiff have the authority to pay Marine's tax arrears although he remained on to supervise the company during the receivership.

In 1954 the trustee in bankruptcy filed two suits in the Court of Claims (numbered 117–54 and 118–54), seeking damages aggregating $733,530.45 growing out of contracts with the Air Force and the Navy. The Government filed counterclaims. In February 1956 the trustee filed his "report of compromise and settlement and order thereon" in which he recommended that the two suits, including the counterclaims, be dismissed with prejudice, that certain other claims against the Government arising under five contracts between Marine and the Government be waived, and that the sum of $7,251.42 be accepted from the Government in settlement of the claims dismissed and/or waived. The Referee in Bankruptcy approved the recommendation and on May 26, 1956, an order was entered by the District Court of the United States for the Northern District of Texas, Fort Worth Division, confirming the trustee's recommendation. Thereupon, the petitions in the Court of of Claims were dismissed. It is not considered necessary or advisable to ascertain in this action whether the settlement of the contract claims was on a justifiable basis fair to Marine. The aggregate of the claims was far in excess of Marine's unpaid tax liability had the full amount been realized.

In addition to the assessment of a penalty against plaintiff, similar assessments covering portions of the same period were made against Lynch, Flocks, Gerron, and Vollmer. The assessment against Vollmer was abated in full. No penalties were assessed against Law and Strong, who had been treasurers—consecutively—of Marine during 1952 and 1953.

Responsibility for collecting the taxes imposed by section 1400 of the 1939 Internal Revenue Code was placed on the employer by means of deducting or withholding from wages, as authorized by sections 1401 and 1622(a). Section 2707 (a) provided that—

> Any person who willfully fails to pay, collect, or truthfully account for and pay over the tax * * *, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall * * * be liable to a penalty of the amount of the tax evaded, or not paid, collected, or accounted for and paid over, * * *.

The term "person" as used in the foregoing abridgment of subsection (a) of section 2707 was defined in subsection (d) thereof to include—

\* \* \* an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

■ For the purposes of the statute the individual must be responsible and his failure willful. Responsibility without willfulness is not enough. Where responsibility is not established the issue of willfulness becomes moot. So the issue of responsibility is for first determination. This problem of who is the responsible person has engrossed scores of courts [2] and legal savants, including this court's compendium of authorities and criteria in White v. United States, 372 F.2d 513, at p. 516, 178 Ct.Cl. 765, at p. 771 (1967), where it was stated:

The purpose of the section is to permit the taxing authority to reach those responsible for the corporation's failure to pay the taxes which are owing. Dillard v. Patterson, 326 F.2d 302 (5th Cir. 1963); United States v. Graham, 309 F.2d 210 (9th Cir. 1962). Accordingly, the section is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one person. See Linda Scott v. United States, 354 F.2d 292, 296, 173 Ct.Cl. 650, 657 (1965), citing Scherer v. United States, 228 F.Supp. 168, 170 (D.Idaho 1963).

In reaching a determination with respect to the person or persons upon whom to impose responsibility and liability for the failure to pay taxes, the courts tend to disregard, the mechanical functions of the various corporate officers and instead emphasize where the ultimate authority for the decision not to pay the tax lies. For this rea-

son \* \* \* a responsible person is most frequently defined as a person who has "the final word as to what bills or creditors should or should not be paid and when." (Citations omitted.)

After mentioning two approaches which different courts have used, the *White* opinion continues, 372 F.2d at 517, 178 Ct.Cl. at 772:

Both approaches would seem to amount to the same thing—a search for a person with ultimate authority over expenditures of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes. \* \* \*

*White* reiterates at 372 F.2d p. 518, 178 Ct.Cl. p. 775 that "more than one individual may be a responsible person". In the case under consideration others of Marine's officials besides the plaintiff were actually assessed penalties as responsible persons.

■ The broad definition of "person" in section 2707(d) of the Code leaves no doubt that the party subject to the penalty provisions of section 2707(a) is the individual having control of the funds of the taxpayer and failing to pay the withholding taxes. This is not always or necessarily an official of the taxpayer, as in Pacific National Ins. Co. v. United States, 270 F.Supp. 165 (D.C.N.D.Cal. 1967) where a surety controlling the tax-delinquent contractor's funds was held liable to the penalty for willfully failing, as the responsible person, to pay the contractor's withholding taxes. The key question here, therefore, is whether the plaintiff had control of the funds of Marine up to November 10, 1952, with which he could have paid the withholding taxes, but willfully failed to do so. The defendant admits that plaintiff is not liable for the taxes that accrued after November 10, 1952. This narrows the issue to the pre-November 10, 1952, period.

■ As a general proposition it may be safely postulated that one who is the

---

2. Extensively footnoted in Boughner, The 100% Withholding Tax Penalty: How to Fight it Successfully, Journal of Taxation, Vol. 28, No. 4, p. 236, April 1968.

founder, chief stockholder, president, and member of the board of directors of a corporation (such as the plaintiff) is rebuttably presumed to be the person responsible under section 2707 of the Code and is thus liable for the penalty, in the absence of an affirmative showing by him that in actual fact he lacked the ultimate authority to withhold and pay the employment taxes in question, or that his omission was not willful in the statutory sense.

In addressing this issue the plaintiff directs the inquiry to two periods, one before and the other after November 10, 1952, when the Navy took over Marine's V-loan from the Bank and in effect substituted its funds for those of the Bank. As to the earlier period it is significant that the plaintiff does not really deny that during such period he was the person responsible for collecting and paying Marine's withholding taxes; he merely seeks to avoid the penalty assessed him by pleading the agreement with the revenue authorities as providing a reasonable cause for nonpayment of the delinquent taxes. So long as Marine had funds sufficient to pay its taxes the plaintiff, as the person responsible for their payment, was obligated to pay them ahead of other creditors on pain of exposing himself to the risk of being personally liable for them. At various times up to November 10, 1952, the plaintiff could have written a check for taxes and secured a cosigner's signature, instead of which he used available funds to pay other creditors. That he felt he had the power to pay taxes in this period is shown by his aborted effort on November 10, 1952, to make a substantial payment on Marine's current taxes, and reaffirmation of such authority is reflected by the agreement which plaintiff signed in October 1952 with the approval of Marine's board of directors, to meet its delinquent and current taxes according to a time schedule endorsed by the Internal Revenue Service.

However, the unusual and exceptional facts of this case as evidenced by the agreement, the lack of its enforcement, the waiver of the tax liens by the IRS, the policy of the IRS not to collect the tax from the responsible officers of a company if the taxes can be collected from the company (as discussed later) and the prejudicial treatment of the plaintiff by two arms of the government, in our opinion permits the plaintiff to avoid the statutory penalty for the period to November 10, 1952. The *White* case, *supra*, 372 F.2d p. 521, 178 Ct.Cl. pp. 778 and 779, defines willfulness to mean—

> * * * a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government, and that it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness. * * *

Standing alone, that definition would leave the impression that knowledge and failure to pay together amount to willfulness *per se*. However, in discussing willfulness at 372 F.2d 513, 178 Ct.Cl. pp. 778 et seq., *White* recognizes that knowledge of unpaid withholding taxes plus failure of a responsible person to pay them does not make that person's willfulness in the failure absolute where there is reasonable cause for the failure, citing instances where reasonable cause was found in reliance on advice of counsel that taxes were not due (Gray Line Co. v. Granquist, 237 F.2d 390 (9th Cir. 1956), cert. denied, 353 U.S. 911, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957)), and where the responsible person had instructed subordinate personnel to pay the taxes but, without the superior's knowledge, they had not been paid. (Levy v. United States, 140 F.Supp. 834 (W.D.La.1956), Belcher v. United States, 6 A.F.T.R.2d 5495 (W.D.Va.1960), and Wiggins v. United States, 188 F.Supp. 374 (E.D. Tenn.1960)).

However, the court in Monday v. United States, 421 F.2d 1210 (7th Cir. 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 38,

27 L.Ed.2d 48, narrowed the definition of "willfulness" when it said:

> The standard of willfulness should not be construed to include lack of "reasonable cause" or "justifiable excuse." These concepts tend to evoke notions of evil motive or bad purpose which properly play no part in the civil definition of willfulness. * * * [Cases omitted.] In addition, "reasonable cause" and "justifiable excuse" invite consideration of such misleading and improper factors as the financial condition of the business or the demands of creditors. * * * [*Id.* at 1216.]

■ The court in that case went on to define "willfulness" in a charge it said should have been given to the jury as follows:

> "An act is willful if it is voluntary, conscious, and intentional. If you find that plaintiff and/or third-party defendant knowingly used available funds to prefer other creditors over the United States then you must find that he acted willfully." [*Id.* at 1216.]

Both the defendant and the plaintiff agree that this is a correct definition of "willfulness," and we are in accord. But the acceptance of this definition does not settle all the issues in the case, as will be seen below.

■ The agreement between Marine and the IRS for the installment payment of Marine's delinquent taxes drastically changed plaintiff's position with respect to his immediate personal liability for the payment of such taxes. True, the agreement did not cancel nor erase his contingent liability for the taxes, but it did have the effect of suspending his liability until the taxes could be collected from Marine by the carrying out of the agreement.

This agreement was a solemn contract between Marine and the United States, acting through its duly authorized agent, the IRS. It was for the benefit of both Marine and the plaintiff, as well as the United States. All parties had a right to expect the contract to be fully carried out. The record shows that the plaintiff adhered to the terms of the agreement and made the payments on schedule as long as he had authority to do so, but his authority was terminated on November 10, 1952, when the Navy took over the financial management of the company. Thereafter, the responsible officer or employee of the company who was charged with the responsibility of carrying out the agreement and paying the delinquent taxes as well as those currently due was someone other than the plaintiff, who was under the complete domination and control of the Navy.

When the Navy took over the management and control of the company on November 10, 1952, it knew about the agreement made between Marine and the IRS as to the payment of the delinquent taxes and recognized it as a binding agreement of the United States, as shown by the payment by the Navy of two installments of $8,000 each on December 1, 1952, and January 3, 1953, on the pre-August 1 tax arrears, in full compliance with the agreement. But after these two payments had been made, the Navy caused Marine to breach the agreement by not allowing it to make any further payments on the delinquent taxes in accordance with the agreement. This was actually a breach of the contract by the United States, acting through the Navy as its authorized representative.

Furthermore, the Navy wrote the IRS on August 14, 1953, and advised it that the tax indebtedness due the IRS would be paid out of any excess funds left over after all claims of the Air Force and Navy, including the latter's loan, had been paid in full. The IRS agreed to this plan as shown by its complete inaction and its failure to foreclose its tax liens on Marine's unencumbered property worth more than $98,000, as shown above. This amounted to a waiver by the IRS of its tax lien and this had the effect of absolving the plaintiff of liability for the delinquent taxes to this extent. This is true for the obvious reason that taxes equal to the value of Marine's property

could have been collected by IRS had it foreclosed its tax liens upon default of the payments of the tax arrears as provided in the agreement with Marine. The record shows that the IRS never foreclosed its tax liens on Marine's property even in Marine's bankruptcy proceedings, and by such failure completely waived such liens, all to the detriment of the interests of the plaintiff, as well as the IRS.

The following facts showing the earnings of Marine after the Navy took over on November 10, 1952, until the end of Marine's bankruptcy proceedings, reveal that the delinquent taxes could have been collected by the government from Marine during such period. This was possible not only from Marine's earnings, but also to a large extent from the value of Marine's property which was subject only to the tax liens of the IRS for such taxes, and which was worth over $98,000. From November 12, 1952, to August 4, 1953, when Marine petitioned for bankruptcy reorganization, a total of $1,633,612.99 was generated by Marine's contract earnings. As source, custodian and dispenser of these funds under contract assignments, the Navy retained $466,492.22 to apply to the principal and interest on the note, while it authorized the release of $1,167,217.87 for the payment of Marine's operating expenses, including $16,-000 for application to Marine's pre-August 1 tax arrears under its agreement with the IRS of October 1, 1952, as already observed. The Navy supervised directly or indirectly Marine's use of the $1,167,217.87 released to it during this period, and significantly none of it was used to pay Marine's tax backlog which is the subject of this suit.

It is interesting to note that from November 12, 1952 to March 6, 1953, the Navy did not apply any contract proceeds to the note, and this is explained by the fact that during this period the Navy continued to hope that Marine would be able to find another bank to take over the loan through the offices of the group that supplied the surety performance bond. When it appeared that this was not going to materialize, the Navy proceeded forthwith to make heavy reductions of the note balance by retention of contract earnings due Marine, so that from March through July 1953 contract proceeds totaling $466,492.22 were applied to the principal and interest on the note, while contract proceeds totaling $551,744.26 were turned over to Marine for closely supervised payment of selected bills for labor and materials. Following August 4, 1953, when Marine applied for bankruptcy reorganization, which eventually ripened into bankruptcy, all of the contract proceeds received thereafter ($181,928.55) were applied to liquidate the principal and interest on the note held by the Navy as a preferred creditor, while nothing was applied to Marine's remaining indebtedness, including its accrued taxes. Obviously, it could not be said that, during the pendency of the bankruptcy proceedings, plaintiff had any responsibility or authority whatsoever to direct the payment of Marine's tax obligations.

The defendant argues that the decisions in Monday v. United States, *supra*, and Spivak v. United States, 370 F.2d 612 (2d Cir., 1967), cert. denied 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625, require our decision in this case to be in favor of the government and against the plaintiff. We do not agree. The facts in those cases differ from the facts in the instant case. Each case must be decided according to the facts involved therein. We think there is language in the decisions in those cases which support the plaintiff's position under the peculiar facts of this case. Both cases hold, in effect, that if the delinquent withholding taxes can be collected from the company, the responsible officer thereof, who would otherwise be liable, is released from such liability. For instance, in *Spivak*, the court said:

Had the government's claim in the bankruptcy been defeated by an adjudication that the payments should have been credited to Lincoln, [the company] the government concedes that it would be bound to release ap-

pellants, [the responsible officers] for it is its practice not to attempt enforcement of § 6672 liability if the corporate obligation is met, * * *. [*Id.* at 615.]

To the same effect is the statement of the court in Monday v. United States, *supra*, where the court said:

* * * While the referee's order in this case cannot satisfy or remove the officers' liability, it might nevertheless bar action against the Mondays were they to show that an administrative practice existed, such as referred to in *Spivak*, that the Government would not press its claim against the responsible officers where the corporate obligation has been met. Cf. 370 F.2d at 615. * * * [*Id.* 421 F.2d at 1218, n. 7.]

After oral argument in this case, the court's secretary, acting on instruction from the court, inquired by letter of the Department of Justice whether or not at any time or times relevant to the refund claim in this case the IRS had a policy or practice which was the same as, or comparable to, the policy or practice described or referred to in the above quoted portions of the *Monday* and *Spivak* cases. The Attorney General answered this inquiry as follows:

The answer to this question is that during this period the Government did have the same or a comparable policy and practice, i. e., not to attempt enforcement of Section 6672 liability (Sec. 2707(a), 1939 Code) of a responsible officer if the corporate obligation was met. This policy was stated in an internal memorandum, IR–Mim. No. 56–46, dated April 9, 1956, copies of which are enclosed herewith. We also enclose 12 copies of this letter for the convenience of the Court. [Ltr. from Justice Dept. dtd. Nov. 20, 1970.]

An examination of said Internal Memorandum No. 56–46, shows that it contains the following in pertinent part:

## ASSERTION OF THE 100 PERCENT PENALTY AGAINST RESPONSIBLE OFFICERS OR EMPLOYEES

* * * * * *

*Section 7. Policy*

* * * * * *

.02 It has been the administrative policy of the Internal Revenue Service, and such policy is hereby reiterated, to use the 100 percent penalty provided by section .2707(a) of the 1939 Code and 6672 of the 1954 Code primarily as a collection device, *and to assert it against responsible officers or employees of a corporation only when it is determined that the taxes involved cannot be collected from the corporation itself;* * * *. [Emphasis supplied.]

.03 It is not necessary to wait until it has been fully determined whether a corporation is or is not going to pay the employment taxes due before asserting the 100 percent penalty against the responsible corporate officers or employees. Such action may be instituted at any time if it has been determined that the corporation is continuing to file Forms 941 without remittance *and there are no tangible assets against which distraint can be made.* [Emphasis supplied.]

*Section 8. Procedure for the Assertion of the 100 Percent Penalty*

.01 When the collection officer determines that collection of employment taxes *cannot be made from the corporate-taxpayer* he will make an investigation to determine whether collection can be made from the responsible officers or employees by the assertion of the penalty for the portion of the taxes required to be withheld. * * * [Emphasis supplied.]

.02 A full report of the collection officer's findings will be prepared and submitted to the group supervisor for approval. This report should be as

complete as possible and should contain the following information: * * (8) *a detailed statement by the collection officer as to why the tax cannot be collected from the corporation;* * * *. [Emphasis supplied.]

* * * * * *

.04 If the taxpayer agrees to the assessment without requesting a conference, a letter (see Exhibit B) will be used in transmitting to him that portion of the report which outlines *the reasons why the tax could not be collected from the corporation,* * *. [Emphasis supplied.]

* * * * * *

*Section 10. Collection Procedure*

.01 If a 100 percent penalty is asserted against one or more responsible corporate officers or employees equal to the withheld portion of the corporate employment tax liability and that portion of the tax is subsequently collected in full or in part from the corporation, the 100 percent penalty or penalties may be abated or if collected may be refunded in an amount equal to the amount collected from the corporation for the same periods from which the penalty arose, providing the claim is filed within the applicable statutory periods.

* * * * * *

█ It may be seen from the foregoing memorandum that the policy of the IRS set forth therein is the identical policy mentioned in the *Monday* and *Spivak* cases that would bar the collection of the taxes from a responsible corporate officer "if the corporate obligation has been met." A careful reading of the portions of the memorandum quoted above shows that the test is not whether the corporate obligation has been met, but whether the taxes *cannot be* or *could not be* collected from the corporation and whether *there are no tangible assets against which distraint can be made.* The record here shows that after the Navy took over the management of Marine's financial affairs and

plaintiff's authority as a responsible officer of the company was terminated, Marine earned and collected $1,633,612.-99 up to the date it filed its petition in bankruptcy. The sum of $181,928.55 was collected after the bankruptcy proceedings were filed. From these figures, it is clear that the delinquent taxes could have been collected from Marine. Had this been done, under the admitted policy of the IRS, the plaintiff would have been released from his obligation to pay the taxes and the present action against him for such taxes would have been barred.

But the Navy did not collect the taxes, and, instead, paid itself $648,420.77, which included $18,943.02 as interest on its note. By paying itself interest, the Navy actually made a profit on the transaction.

In the meantime, the IRS did nothing to foreclose its tax liens on Marine's property. Had it done so, plaintiff would have been released from his tax obligation to the extent of the amount realized from such foreclosures, as is provided in the above policy memorandum of the IRS.

██ Normally, we would not readily substitute our discretion for the Commissioner's as to when the taxes are to be collected from the corporation. But here the facts are such because of the interdepartmental dealing that the Commissioner abused his discretion in failing to collect the tax from the corporation.

Furthermore, in the *Monday* case, the court indicated that the responsible officers of the company would have been relieved of their responsibility for the taxes if they had shown any action by the government upon which they could reasonably have relied as the grounds for their failure to collect and remit any of the withholding taxes withheld from their employees. In this connection, the court said:

* * * The taxpayers have failed to disclose any action by the Government upon which they could reasonably have relied as the grounds for their failure to collect and remit any of the taxes

withheld from their employees. [Citing the *Spivak* case.] [421 F.2d at 1218.]

By contrast, the record in this case is replete with acts of commission and failure to act on the part of the government upon which plaintiff could reasonably have relied as grounds for his failure to collect and remit the taxes, all of which are detailed herein. As a matter of fact, after the Navy took over Marine on November 10, 1952, the Navy made it impossible for plaintiff to collect and remit the taxes. After that date, the Navy had a special obligation to collect and remit the delinquent taxes from the earnings of Marine in monthly installments of $8,000 each as provided in the government's agreement with Marine. The Navy had no right to cause the government to breach this agreement after making only two monthly payments of the tax arrears. It seems to have been the attitude of the Navy that it did not have to carry out the agreement because it was made by another department of the government (the IRS). This is too slender a reed to justify the Navy's acts which caused the breach of the agreement. After all, both departments are agencies of one government, namely, the United States. The Navy was obligated to respect and carry out the agreement made by the IRS in accordance with its authorized powers, when it was within the power of the Navy to do so. It had no right to pay itself and other creditors under these circumstances without paying the taxes due the IRS as required by the agreement.

By reason of all of the foregoing, the plaintiff was released from his liability for the payment of the delinquent withholding taxes and the government is barred from collecting them from him.

Accordingly, judgment is entered for plaintiff on his petition, with the amount to be determined by further proceedings under Rule 131(c), and the counterclaim of defendant is dismissed.

DAVIS, Judge (concurring in the result):

I agree with the judgment, as well as with the court's positions that (a) plaintiff was the responsible "person" under the statute for the period prior to November 10, 1952, (b) he was not, as the defendant admits, such a responsible "person" beginning with November 10th; (c) he acted "willfully", within the meaning of the statute, during the time he was the responsible "person"; but (d) under the Internal Revenue Service's policy he was not liable for any of the unpaid taxes (accrued before November 10th) because they could all have been collected from the company. This separate opinion is written because I cannot concur in the interpretation the court makes of, and the implications it draws from, the agreement between the company and the Service (dated October 1, 1952). The court's opinion treats that agreement as if, by itself, it covered plaintiff, immunized him, and was made for his benefit. My view, to the contrary, is that this agreement related solely to the relations between the company and the Service, and did not by itself affect the separate and independent liability of the responsible "person" (plaintiff in this instance) under the "penalty" provisions of the legislation. This seems to me to follow from the teaching of the cases up to this one,[1] as well as from the plain fact that plaintiff was not a party to the agreement, which nowhere mentions him or his separate liability, either expressly or by fair implication. If there were no Service policy applicable to this case, I would have to hold—particularly under the reasoning of the latest cases: Monday v.

1. See Monday v. United States, 421 F.2d 1210 (C.A.7, 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); Newsome v. United States, 431 F.2d 742 (C.A.5, 1970); Spivak v. United States, 370 F.2d 612 (C.A.2), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967); Kelly v. Lethert, 362 F.2d 629 (C.A.8, 1966); Singer v. District Director of Internal Revenue, 354 F.2d 992 (C.A.2, 1966); Cash v. Campbell, 346 F.2d 670 (C.A.5, 1965).

United States, 421 F.2d 1210 (C.A.7, 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); Spivak v. United States, 370 F.2d 612 (C.A.2), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967); and Newsome v. United States, 431 F.2d 742 (C.A.5, 1970)—that the October 1st agreement had no effect on plaintiff's distinct and independent obligation for the unpaid taxes accruing in the earlier period.

We have, however, now determined that the IRS policy mentioned in *Spivak* and *Monday* also existed in this case, and that crucial policy makes the difference. As Judge Skelton points out, the policy forbids collection of the "100 percent penalty" from the responsible person where the taxes involved *can* be collected from the corporation itself. In this instance, the taxes could clearly have been collected from Marine if the IRS had wished to do so, either from the company's earnings or out of its distrainable property. The Service elected not to do so, but that was its own choice, apparently out of regard for the Navy's desire to have contract performance continue and to recover back the Navy-guaranteed loan. If all the parties to the transactions, except IRS, had been private firms, the Service could (and probably would) have insisted on collecting the unpaid taxes. If it had refrained, as it did here, out of leniency or to allow production to continue or to help the private lender, the formal IRS policy would certainly have precluded collection from the responsible individual. It makes no difference that here the Navy happened to be the lender. The IRS had the same choice of whether to collect or not—it could have insisted on getting its taxes from the company—but it chose not to. The same consequences should follow as if the lender were a private bank.

From this viewpoint, I need not (as the court does) hold the Navy to blame or delve into the complex problem of when one agency of the Federal Government stands in the shoes of another. The focus is and should be on the IRS, not on the Navy. The latter was not a part of the October 1st agreement between Marine and the IRS; and I assume that the Navy acted lawfully, under the explicit terms of its V-Loan Guarantee Agreement, when it insisted, as any lender will if it can, that money coming into the company's hands be first used to repay the Navy's loan. But the Internal Revenue Service was not forced to agree to that order of priority, as it would not have been forced if a private bank were the creditor. The Service decided for itself to acquiesce in the Navy's wishes, and that Service decision automatically brought into operation the policy against collecting from the responsible person where the tax *can* be collected by IRS from the corporation but is not. Cf. Spivak v. United States, *supra*, 370 F.2d at 615; Monday v. United States, *supra*, 421 F.2d at 1218 nn. 7–8. There is no reason implicit in the policy, or demanded by justice, for allowing the Navy to collect its debts first, without affecting the liability of the responsible person, if a private creditor would not have the same power.

NICHOLS, Judge (concurring):

I agree generally with Judge Skelton's handling of this case and therefore concur in his opinion, but I would somewhat shift the emphasis and spell out some matters he takes for granted.

The issue is, as I see it, one of statutory construction and one for application of our old friend Church of Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). That case is at times mis-cited, and perhaps it has been by me, but on mature reflection about it what it stands for I believe is: The Congress can enact a statute that appears in unambiguous language to assess Draconic penalties for actions, some of which may be quite innocent, but it can count on the executive and judicial branches to take note of what it really meant to accomplish and exclude the law from application to cases not within Congressional contemplation.

The 1956 mimeograph referred to by the court shows that without any express

warrant in the statute the IRS has restricted the assessment of penalties under § 2707 of the 1939 Code and § 6672 of the 1954 Code to cases where the tax cannot be collected from the corporation, and only to the extent of the employee's portion of the withholding. It has used the penalty "primarily as a collection device." When these practices started we are not informed, nor whether they are still in effect. The copy supplied us shows the mimeograph is now superseded by a provision of the Internal Revenue Manual.

The Secretary of the Treasury has express power to remit forfeitures and penalties incurred under the customs and navigation laws under 19 U.S.C. § 1618, and IRC § 7327 extends this to forfeitures under the Internal Revenue laws. There may perhaps exist other authority of that kind, but the mimeograph does not purport to be an exercise of any authority of that kind.

This "policy" as it is called, is also not a regulation. Congress gave no authority to write one under these particular sections, which were meant to be automatic in their application, although it is true that Internal Revenue penalties, under IRC § 6671, are payable only on notice and demand. We must presume they thought they had a right to do this, and therefore, though called a "policy" it does reflect a construction of the statute by the administering agency. It is a reasonable construction in light of *Holy Trinity*, and thus one we should adopt. I do not think, however, that it would be proper for the courts to mitigate the application of penalties without independent consideration, whenever the circumstances were shown to be circumstances under which the IRS did not normally demand payment. *Cf.* Wagner v. United States, 387 F.2d 966, 181 Ct. Cl. 807 (1967). Conversely, I think that

in the totality of circumstances proven here the *Holy Trinity* precedent would make our holding the proper one even if there were no mimeograph. I was prepared so to hold before I heard of the mimeograph, as our commissioner, of course, recommended.

The mimeograph is a now-you-see-it-now-you-don't kind of thing. Apparently the court in Monday v. United States, 421 F.2d 1210 (7th Cir. 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed. 2d 48, got a clue to its existence from Spivak v. United States, 370 F.2d 612, 615 (2d Cir. 1967), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625, but declined to take judicial notice of it. I commend the Government counsel herein because they divulged it ungrudgingly on our request, but it seems to me that such a thing as this mimeograph ought to be notified by publication to all courts and litigants and it is not fair for it to benefit one court or litigant and not another. The business of giving effect like regulations to all sorts of papers emanating from the executive branch, is one that should cause concern.

The "agreement" quoted in the opinion is shown in the findings (which will not be reproduced in F.2d) to have been altered (before delivery?) by the signing Government officer. He tore out his signature for fear he lacked authority to sign it. But it was carried out for a time, as found, just as if it were effective and authorized. The commissioner found it was "an agreement", and defendant did not except. I would call this a conclusion of law. My approach to the case does not oblige me to rely heavily on this "agreement". I would not be able to do so without further study than I deem necessary as things are, and I do not rely on it, except as a part of the total circumstances.