The **FIDELITY & CASUALTY COM-
PANY OF NEW YORK**

v.

The **UNITED STATES.**

No. 329–69.

United States Court of Claims.

Jan. 23, 1974.

Thomas M. Gittings, Jr., Washington, D. C., attorney of record, for plaintiff. John B. Harris, Jr., Macon, Ga., of counsel.

Robert H. McKnight, Jr., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews and Joseph Kovner, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to a recommended decision filed February 22, 1973, by Trial Judge Thomas J. Lydon pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision, as hereinafter set forth,* it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

Plaintiff, a New York surety company, authorized to do business in the State of Georgia, seeks to recover $24,-287.57, plus interest, representing federal income and F.I.C.A. (social security) withholding taxes it paid on behalf of a contractor, Stradtman-Georgia Construction Company, to whom it had furnished payment and performance bonds attendant to contracts which the contractor had with the cities of Macon and Brunswick, Georgia. Plaintiff's claim is grounded on the contention that it paid said taxes under duress.

It is my opinion that plaintiff is not entitled to recover.

The detailed and separate findings of fact accompanying the trial judge's opinion set out the relationship and dealings between plaintiff and the contractor, as well as between plaintiff and the Internal Revenue Service (IRS). Only a brief summary of the facts are set forth in this opinion.

The contractor entered into "Contract C–1963" with the city of Macon, Georgia, on March 26, 1964, where, for the contract price of $678,247.05, it agreed to construct sanitary sewage system improvements. On July 8, 1964, the contractor entered into "Contract D" with the city of Brunswick, Georgia, where, for the contract price of $34,512.25, it agreed to construct improvements to a sanitary sewage system. Plaintiff furnished the contractor with payment and performance bonds covering both contracts.

In mid-December 1964, the contractor advised plaintiff it would be unable to complete either contract unless it received financial assistance. The contractor was considered competent, capable and honest, and those city officials who were in charge of contract performance, on the Macon contract in particular, were extremely anxious to keep it on the job. Plaintiff assured itself that the contractor could complete both contracts with financial assistance.

Having decided to extend financial assistance to the contractor, plaintiff took immediate steps to protect its interests. The contractor was required to execute a series of agreements whereby its assets were pledged as security for its existing estimated indebtedness of $200,606.84, as well as all other future liabilities of the contractor under both contracts. Some of these security agreements were duly recorded with the county courts in Macon and Brunswick, Georgia. The contractor was also required to assign to plaintiff

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report of February 22, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

the right to all future earnings emanating from the Macon and Brunswick contracts as well as all future earnings which the contractor might receive from other sources. Trust accounts were established for the Macon contract and the Brunswick contract in order to provide control over the receipt and disbursement of funds applicable to each contract. The contractor's prior account in a Brunswick bank was closed. A dual signature checking account was established in connection with utilization of the trust accounts with Mr. Norman R. Gunn, Jr., plaintiff's Claims Manager in the Macon branch office, or his secretary Mrs. Jo Anne Glover (nee Flynt) authorized to sign for plaintiff and Mr. David G. Stradtman authorized to sign for the contractor. Two signatures were necessary to validate any check drawn on the trust accounts. From January 1965, and thereafter, all contract payments from the cities of Macon and Brunswick were sent directly to, or turned over to, plaintiff. The checks were generally payable jointly to plaintiff and the contractor. The totality of the security agreements, assignments, trust accounts, dual checking accounts and bill paying procedures established by plaintiff gave it effective control over the contractor's financial situation. The contractor was unable to pay any bill or obligation without plaintiff's approval since it had no independent funds of its own.

Thereafter, plaintiff paid obligations of the contractor, which it considered covered by its bonds, as well as obligations which it did not consider covered by its bonds. It also refused to pay other obligations although requested by the contractor to do so. In summary, plaintiff paid those obligations which would ensure that contract performance would continue toward completion. Obligations which did not fall into this category were generally not paid.

In March 1965, IRS advised plaintiff that the contractor owed some $9,404.90, representing federal withholding and F.I.C.A. taxes for the Fourth Quarter of 1964. A Notice of Tax Lien and a Notice of Levy had been filed in the county courts of Macon and Brunswick, Georgia. IRS agents visited Mr. Gunn in his Macon office and advised, in essence, that unless the taxes were paid the contractor would be shut down. They further advised Mr. Gunn that one who had authority to pay such taxes and refused to do so could be personally liable for the taxes and could go to jail. Presumably the agents believed Mr. Gunn had authority to pay the taxes but Mr. Gunn advised the agents he had no such authority. Both the cities of Macon and Brunswick advised plaintiff that no further payments would be made under the contracts until the government's tax lien was satisfied. Both cities requested plaintiff to satisfy the tax indebtedness of the contractor. The contractor had no funds with which to make payment on its tax indebtedness but would have made said payments if it were financially able to do so. The contractor also requested plaintiff to pay the tax indebtedness on its behalf with the full understanding that the contractor would reimburse plaintiff for said payments. In view of these circumstances and to prevent the contractor from being shut down, Mr. Gunn obtained authority from the plaintiff's Atlanta office to pay the tax indebtedness of the contractor.

In making payment to IRS, plaintiff advised it was doing so as an expedient, and expressly denied any legal responsibility on its part to the government for payment of such taxes. Plaintiff was of the view that its bonds did not cover the taxes owed by the contractor and that it was not an employer with responsibility to collect and turn over to IRS federal withholding and F.I.C.A. taxes incurred by the contractor although these views were not articulated in the letter it sent IRS transmitting the tax payment.

The situation with respect to the contractor's tax indebtedness for the Fourth Quarter of 1964 set out above was repeated with respect to the contractor's tax indebtedness for the First Quarter

($7,108.43) and the Second Quarter ($7,-774.24)[1] of 1965. Plaintiff paid the contractor's tax indebtedness for these Quarters upon being advised by IRS agents that failure to pay the taxes would result in the contractor being shut down. IRS agents again advised plaintiff's personnel—Mr. Gunn relative to the First Quarter assessment and Mr. Anderson, a subordinate of Mr. Gunn, relative to the Second Quarter assessment—that they, as individuals authorized to pay the taxes, could be subjected to personal liability and perhaps jail if the taxes were not paid. Neither of these individuals had authority to pay the taxes, and, as was the case previously, authority to pay the taxes was obtained from plaintiff's Atlanta office. The contractor in both instances requested that said tax payments be made by plaintiff on its behalf with the full understanding that it would reimburse plaintiff for said payments. In transmitting the payments to IRS, plaintiff again expressly denied any legal responsibility for the contractor's tax indebtedness and further advised that no such legal liability on its part should be assumed merely because it was advancing sums to the contractor.

In September 1965, plaintiff was again requested to pay additional taxes owed by the contractor, representing federal withholding and F.I.C.A. taxes ($5,183.-20) for the Third Quarter of 1965 and F.U.C.I. (Federal Unemployment Contribution Act) taxes ($9,733.55) for the tax period ending December 31, 1964. IRS agents visited Mr. Gunn and again advised that the contractor would be shut down if the taxes were not paid. They also advised, as they had done previously, that Mr. Gunn could be personally liable for the taxes and could go to jail if the taxes were not paid. At this stage of contract performance (the Brunswick contract was completed and the Macon contract was close to being completed) plaintiff determined it had gone as far as it could go with the contractor and refused to pay the taxes. However, the contractor wanted plaintiff to pay these taxes.

Upon being advised by plaintiff that it would not pay the contractor's existing tax indebtedness, IRS took steps to implement its levy on the contractor's equipment and as a result the contractor was forced to terminate its Macon contract operations. Plaintiff thereafter obtained a replacement contractor to complete the work.

Plaintiff subsequently filed claims for refund of the taxes it paid on behalf of the contractor with the District Director, Southeast Region, IRS, contending said payments were made under duress. The claims were denied on the ground plaintiff was not the taxpayer. Plaintiff thereafter filed suit in this court.

■■ At the outset, defendant raises the question of jurisdiction.[2] Defendant suggests that since plaintiff paid the taxes in issue on behalf of the contractor, which payments were credited by IRS against the contractor's tax indebtedness, it, as a nontaxpayer, has no claim which it can assert in this court. The fact that plaintiff is a nontaxpayer[3] does not, without more, serve to delimit the court's jurisdiction. Defendant recognizes this fact and also acknowledges, with a lack of enthusiasm, that the case of Kirken-

1. The Second Quarter assessment included the sum of $2,038.12 which was the responsibility of another surety, New Amsterdam Casualty Co. This surety company reimbursed plaintiff the sum of $2,038.12. However, plaintiff still seeks to recover here the full amount of its payment to IRS. There is no basis on this record, and no case law has been cited, which would justify recovery by plaintiff in this regard. To the extent that New Amsterdam is indebted to plaintiff on other mat-ters, plaintiff must proceed against New Amsterdam and not defendant.

2. Plaintiff's jurisdictional statement refers to 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1491.

3. The filing of a claim for refund does not convert a nontaxpayer into a taxpayer. Economy Plumbing & Heating Co. v. United States, 470 F.2d 585, 589, 200 Ct.Cl. 31, 37 (1972).

dall v. United States, 31 F.Supp. 766, 90 Ct.Cl. 606 (1940) supports jurisdiction here on the basis of a contract implied in fact, i. e., defendant has received and still possesses, money which came from plaintiff under circumstances which may create a contract implied in fact. Accordingly, the court, in these situations, will assume jurisdiction, under 28 U.S.C. § 1491, and decide the case on the merits even though defendant may ultimately prevail. Ralston Steel Corp. v. United States, 340 F.2d 663, 668–669, 169 Ct.Cl. 119, 126–127, cert. denied 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

■■ The parties are in agreement that plaintiff would not have been legally liable for payment of the contractor's tax indebtedness as an "employer" under pertinent provisions of the Internal Revenue Code of 1954 during the period in question.[4] See Arthur Venneri Co. v. United States, 340 F.2d 337, 169 Ct.Cl. 74 (1965). The parties disagree on whether plaintiff would have been liable for payment of the contractor's tax indebtedness under Section 6672 of the Internal Revenue Code of 1954. Under Section 6672, a surety may be held liable for the tax indebtedness of a contractor if it exercises control over the funds of the contractor with which the contractor could have paid the withholding taxes. See Pacific Nat'l. Ins. Co. v. United States, 422 F.2d 26 (C.A. 9th Cir., 1970) cert. denied, 398 U.S. 937,

90 S.Ct. 1838, 26 L.Ed.2d 269 (1970). Defendant, however, raises Section 6672 as an alternative set off defense to be considered only if it is concluded that plaintiff's payment of the contractor's tax indebtedness was the result of duress. In view of the conclusion reached hereinafter that duress was not present when plaintiff paid the taxes in question, it is unnecessary to come to grips with this troublesome question.[5]

Plaintiff claims it paid the taxes on behalf of the contractor under duress. Its claim centers on conversations between IRS agents and personnel of plaintiff wherein the agents advised that (1) the contractor's operations would be shut down if the then due and owing taxes were not paid; and (2) personal civil and criminal liability was possible if authorized personnel of plaintiff refused to pay these taxes. The facts in the case will not support a finding of duress.

Plaintiff undertook to provide financial assistance to the contractor in late December 1964, in order to keep the contractor on both jobs and thus comply with its bond obligations to the cities of Macon and Brunswick to see to it that both contracts were fully performed. In keeping the contractor on both jobs, plaintiff paid various obligations of the contractor, some it considered covered by its bonds and others it considered not covered by its bonds.[6] In making pay-

4. Plaintiff concedes that under the Federal Tax Lien Act of 1966, 80 Stat. 1138, 1139, 26 U.S.C. § 3505 (1966), which took effect January 1, 1967, it would be legally liable for payment of the taxes here in issue. However, it argues that passage of the Act clearly demonstrates that it was not legally liable for the contractor's tax indebtedness during the period in question. While plaintiff does not articulate the contention in its briefs, it seems to imply that since it paid the taxes of the contractor when it was not legally obligated to do so, it must have done so under duress. However, this approach fails to consider plaintiff's self interest as a surety and the various ramifications of the bonds it furnished the contractor.

5. The court in Pacific Nat'l. Ins. Co., supra, admitted that its interpretation of Section

6672 as encompassing a surety was disputable, but pointed out that the result it reached was one now explicitly required by the Tax Lien Act of 1966 (422 F.2d at 27–28). Moreover, different courts have taken different views of liability under Section 6672. See Lindeman, Confusion over scope of 100% penalty makes it a most "settleable" issue, 38 The Journal of Taxation 50 (Jan. 1973). See also McCarty v. United States, 437 F.2d 961, 967, 194 Ct.Cl. 42, 54 (1971).

6. This fact weakens the force of plaintiff's reliance on the assertion it made to IRS agents that taxes were not covered by its bonds. Plaintiff was motivated to pay the contractor's obligations, whether covered by its bonds or not, in order to avoid a work shut down and to further contract completion. For example, it paid off a chattel mortgage

ments on the contractor's obligations, plaintiff made a determination that such payments were a means of achieving a desired result, *i. e.*, completion of the contracts covered by its bonds.

When plaintiff began to supply financial assistance to the contractor, creditors, suppliers and materialmen began looking to the plaintiff for assurance and/or payment relative to supplies to be furnished and/or furnished. The government, no more than the suppliers and materialmen, was also a legitimate creditor of the contractor. It was reasonable to expect that IRS would also look to plaintiff as a possible source for payment of the contractor's tax indebtedness generated by the contracts, especially since all proceeds from both contracts were being transmitted directly to plaintiff and the contractor was left without funds with which to discharge its tax indebtedness.

It is in this setting that IRS agents approached plaintiff in March,[7] June and August 1965, in an effort to obtain from plaintiff payment of the contractor's tax indebtedness for the Fourth Quarter of 1964 and the First and Second Quarters of 1965. It is recognized that the government, in pursuit of unpaid taxes, has always been a diligent and formidable competitor for any property that might belong to the taxpayer. Under the circumstances, it was not un-

reasonable for IRS agents to approach plaintiff about discharging the contractor's tax indebtedness.

In discussions with plaintiff's personnel, IRS agents made it clear that if the contractor's taxes were not paid, implementation of the Notices of Lien and Levy which had been filed in the appropriate county courts of Georgia would terminate contract performance. The agents also advised plaintiff's personnel (Mr. Gunn and Mr. Anderson) that individuals who had authority to pay taxes could be held personally liable or could go to jail if said taxes were not paid.[8] Neither of the individuals who conferred with the agents had authority to pay the taxes in question and there is no credible evidence in the record that the individual who had the authority to make such payments was apprised of these conversations or threatened in any way with civil or criminal liability. The findings disclose quite clearly that plaintiff paid the taxes on behalf of the contractor in order to prevent the jobs from being shut down.

█ It is obvious that IRS had a right to take appropriate steps to effect payment of overdue taxes. The filing of the Notices of Lien and Levy were proper in this case. The statement of the agents that if the taxes of the contractor were not paid, the contractor would be shut down, was a frank state-

---

on some of the contractor's equipment even though it was not required to do so under its bonds because the contractor needed the equipment to perform the contracts. Under these circumstances, that plaintiff viewed its bonds as not covering taxes is of little moment. Moreover, one surety commentator has pointed out that even before the passage of the Tax Lien Act of 1966, *supra*, most sureties, when financing a faltering contractor saw to it that payroll taxes were paid. Brady, Bonds on Federal Government Construction Contracts: The Surety's View, 46 N.Y.U.L.Rev. 262, 267, n. 28 (1971).

7. Plaintiff was well aware, as early as late January 1965, that the contractor was not paying the taxes in question. Accordingly, the visits from IRS were not a complete surprise to plaintiff.

8. Plaintiff contends that these personal threats influenced it to pay the taxes in question.

However, the facts show that neither Mr. Gunn, nor Mr. Anderson, were intimidated by the threats. Indeed, Mr. Anderson had been prepared for the IRS visit by Mr. Gunn and told to contact plaintiff's attorney. In the last analysis, if either Mr. Gunn or Mr. Anderson were inclined to feel threatened by the remarks of the IRS agents, it was only necessary for them to contact plaintiff's attorney, who was readily available, to learn that since they had no authority to make tax payments, they could not be personally liable. These circumstances will not support duress. Beatty v. United States, 168 F.Supp. 204–205, 144 Ct.Cl. 203, 206–207 (1958). Moreover, in the absence of unusual circumstances, representations as to questions of law generally will not form a basis for setting aside completed transactions. Mills v. United States, 410 F.2d 1255, 1257, 187 Ct.Cl. 696, 700 (1969).

ment of the inevitable consequence which would occur; a statement of an intention to seek a remedy which the law gave to the government in its effort to collect overdue taxes from a delinquent taxpayer. It is never duress to threaten to do what one has a legal right to do. Beatty v. United States, *supra*, 168 F. Supp. at 206, 144 Ct.Cl. at 207.

■ Plaintiff made a reasoned judgment initially to provide the contractor with financial assistance in the expectation that with such assistance the contractor would be able to complete the contracts. When it paid the tax obligations of the contractor it again made a reasoned judgment that such payments were required to keep the contractor on the job, and that it was in plaintiff's best interest to keep him on the job on those occasions. When plaintiff felt it was no longer in its best interest to keep the contractor on the job, it declined to pay the contractor's tax indebtedness covering the Third Quarter of 1965 as well as F.U.C.A. taxes covering the period ending December 31, 1964, and the inevitable consequence occurred—contract performance was terminated. The point is plaintiff was completely free to pay the taxes or not; it has no valid right now to complain of the choice it made to pay the taxes for the Fourth Quarter of 1964 and the First and Second Quarters of 1965. Beatty v. United States, *supra*, 168 F.Supp. at 207, 144 Ct.Cl. at 207.

■ Even viewed in a light most favorable to plaintiff, the actions of IRS in the circumstances surrounding payment of the taxes by plaintiff cannot be considered so overpowering as to have inhibited plaintiff from the unfettered exercise of its reasoned judgment. Plaintiff was an experienced surety company with competent legal advice readily available. When it paid the taxes on

behalf of the contractor it did so in the belief it was acting in its best interest. The money that IRS took was voluntarily proffered by plaintiff in satisfaction of tax liabilities of the contractor admittedly owing to the United States.[9] In making said payments plaintiff gained the advantage of keeping the contractor on the job. It was plaintiff's business judgment that the contractor should remain on the job, in furtherance of plaintiff's own interest under its bonds. Payment of the contractor's tax obligations was necessary to keep it on the job. The mere stress of business conditions will not support duress contentions where the government is not responsible for the underlying circumstances. Commonwealth Engineering Co. v. United States, 180 F.Supp. 396, 398, 148 Ct.Cl. 330, 334 (1960), cert. denied, 364 U.S. 820, 81 S.Ct. 55, 5 L.Ed. 2d 50 (1960).

It is also noted that plaintiff paid the taxes on behalf of the contractor at the specific request of the contractor with the full understanding that the contractor would reimburse plaintiff. Under these circumstances it is not unreasonable to view the tax payments by plaintiff as advances. Indeed, plaintiff in its June 3, 1965, and August 6, 1965, letters to IRS transmitting the tax payment due for the First and Second Quarters of 1965 advised that by virtue of its advancing sums to the contractor it was not admitting that it was legally liable for payment of such taxes. Plaintiff may have a cause of action against the contractor on whose behalf it paid the taxes, but it has no valid claim against defendant. Ralston Steel Corp. v. United States, *supra*, 340 F.2d at 672, 169 Ct.Cl. at 133.

As the court noted in J. C. Pitman & Sons v. United States, 317 F.2d 366, 369, 161 Ct.Cl. 701, 707 (1963), it had "the

---

9. It is not clear from the record whether any of the progress payments earned by the contractor were utilized and/or available for payment of the taxes. The Macon Trust Account indicates that from February 3, 1965, to April 27, 1965, progress payments of some $112,303.46 were deposited therein. An additional progress payment of $16,274.08 was

deposited in the trust account in July 1965. However, since there is no record of disbursements from either of the trust accounts, one cannot say whether in March or June or August 1965 there were sufficient progress payment funds available to cover the taxes then paid.

impression that the payment of one's taxes by another is not an unusual occurrence." It would seem that, when a surety makes tax payments on behalf of a contractor to whom it has furnished bonds it is even less unusual, especially when it publicly undertakes to provide financial assistance to the contractor.[10]

There are no circumstances in this case whereby a contract implied in fact can be established based on the dealings between IRS and the plaintiff. Plaintiff has failed to carry its burden in this regard, and it must be placed in the fatal category of a volunteer. J. C. Pitman & Sons v. United States, *supra*, 317 F.2d at 369–370, 161 Ct.Cl. at 706–707.

Plaintiff's petition should be dismissed.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

10. *See* Brady, *supra*, note 6, at 267, n. 28.