FLORIDA SUGAR MARKETING AND TERMINAL ASSOCIATION, INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 99–1440.

United States Court of Appeals, Federal Circuit.

July 28, 2000.

Wesley K. Caine, Stewart and Stewart, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Terence P. Stewart, Lane S. Hurewitz and Patrick J. McDonough.

Todd M. Hughes, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Lara Levinson, Attorney. Of counsel on the brief was Richard McManus, Office of the Chief Counsel, United States Customs Service, of Washington, DC.

Before NEWMAN, MICHEL, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Florida Sugar Marketing and Terminal Association, Inc. ("Florida Sugar") appeals from a decision of the United States Court of International Trade dismissing Florida Sugar's claim for refund of the Harbor Maintenance Tax ("HMT") for failure to state a claim. In this HMT test case, the trial court held that the Export Clause of the United States Constitution, U.S. Const. Art. I, § 9, cl. 5, does not prevent Congress from imposing the HMT on Florida Sugar's shipments between seaports of different states because the clause applies only to shipments to foreign countries, not to interstate shipments. *See Florida Sugar Mktg. & Terminal Ass'n, Inc. v. United States,* No. 99–28, slip op. at 5, 40 F.Supp.2d 479, 480 (Ct. Int'l Trade Mar. 23, 1999). Florida Sugar timely appealed to this court. The appeal was submitted for our decision following oral argument on April 7, 2000. Because we hold that the Export Clause does not prohibit the federal government from imposing taxes or duties on interstate shipments, we affirm the trial court's dismissal of this action.

## BACKGROUND

The HMT, enacted in 1986 as part of the Water Resources Development Act ("WRDA"), Pub.L. No. 99–662, § 1402(a), 100 Stat. 4082, 4266, provides funding for maintenance of the nation's seaports. The HMT imposes a levy on commercial vessels using the ports. The statute directs that the HMT be assessed on importers, exporters, domestic shippers, and commercial passenger transport. *See* 26 U.S.C. §§ 4461, 4462 (1994 & Supp. III 1997).[1]

---

1. The relevant portion of the statute reads as follows:

   § 4461. Imposition of Tax.

   (a) General Rule.—There is hereby imposed a tax on any port use.

   (b) Amount of Tax.—The amount of the tax imposed by subsection (a) on any port

The revenues from the HMT fund WRDA projects such as harbor dredging. In the case of interstate shipments, the tax is imposed on the shipper and liability attaches at the time of unloading. Between January 27, 1995 and February 20, 1998, Florida Sugar paid HMT on sugar it shipped by vessel from one state to another. Those payments are the subject of this appeal.

The Export Clause constrains the federal taxing power, providing that "[n]o Tax or Duty shall be laid on Articles exported from any State." U.S. Const. Art. I, § 9, cl. 5. In *United States v. United States Shoe Corp.*, 523 U.S. 360, 370, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998), the Supreme Court affirmed this court's holding that the HMT, as applied to exports to foreign countries, was an unconstitutional tax, rather than a "user fee." This court has subsequently held that the application of the HMT to exports is severable from the other applications of the tax, such as to imports and passage on passenger liners. *See Carnival Cruise Lines v. United States*, 200 F.3d 1361, 1369 (Fed.Cir.2000).

Following the decision in *U.S. Shoe*, a number of cases were filed in the Court of International Trade seeking refunds of HMT payments on the ground that the tax was unconstitutional. Florida Sugar's suit was designated as a test case for the question of whether the Supreme Court's ruling in *U.S. Shoe* would extend to interstate shipments. The Court of International Trade held that it did not and dismissed the complaint for failure to state a claim. *See Florida Sugar*, 40 F.Supp.2d at 480. Florida Sugar timely appealed to this

court, which has jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

Florida Sugar argues that the Export Clause must reach shipments between seaports in various states of the Union because, at the time of the Constitutional Convention, the word "exports," as commonly used, encompassed shipments among the several states. In addition, Florida Sugar argues that the language in the Supreme Court decisions, on which the Court of International Trade decision relied, is incorrect dicta that should not be followed by this court.

■ No facts are in dispute, the only question before this court being one of constitutional interpretation. On such questions of law, decisions of the Court of International Trade are subject to *de novo* review by this court. *See Medline Indus., Inc. v. United States*, 62 F.3d 1407, 1409 (Fed.Cir.1995). Because the Supreme Court has never directly addressed the issue in this case, we look first to the language of the Constitution and the evident intent of the Framers. We also seek guidance in the Supreme Court's statements regarding the breadth of the Export Clause prohibition, although those statements are made in the context of international, not interstate, shipments.

### I.

#### A.

■ The issue we face here is whether the Framers intended the Export Clause

use shall be an amount equal to 0.04 percent of the value of the commercial cargo involved.

(c) Liability and Time of Imposition of Tax.—

(1) Liability.—The tax imposed by subsection (a) shall be *paid by*—

  (A) in the case of cargo entering the United States, the importer,

  (B) in the case of cargo to be exported from the United States, the exporter, or

  (C) *in any other case, the shipper.*

(2) Time of Imposition.—Except as provided by regulations, the tax imposed by subsection (a) *shall be imposed*—

  (A) in the case of cargo to be exported from the United States, at the time of loading, and

  (B) *in any other case, at the time of unloading.*

Pub.L. No. 99–662, § 1402(a), 100 Stat. 4082, 4266 (codified as amended at 26 U.S.C. §§ 4461, 4462) (emphasis added).

to prohibit taxes only on goods shipped from the United States to foreign nations, or whether they also intended to withhold from the federal government the authority to tax any movement of goods between states. Florida Sugar argues for the latter interpretation, based upon eighteenth century common usage of the term "export" to describe both interstate and foreign commerce. In support of its argument, Florida Sugar makes an extensive showing that common usage of the term "export" often included shipments to other states in the Union.

Florida Sugar also relies heavily on a dissenting opinion discussing the dormant Commerce Clause, in which Justices Scalia and Thomas expressed their view that "a strong argument can be made that for the Constitution's Framers and ratifiers ... the terms 'imports' and 'exports' encompassed not just trade with foreign nations, but trade with *other states* as well." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine,* 520 U.S. 564, 621, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Thomas, J., dissenting) (emphasis in original). Like the dissenters in *Camps Newfound,* Florida Sugar points to numerous examples of eighteenth century usage of the terms. It cites, for example, a letter to a Connecticut newspaper asserting that the state could produce stockings "sufficient not only to supply [itself], but for *exportation* to other States." Appellant's Brief at 9 (citing a reprint in the *Massachusetts Centinel,* Sept. 5, 1787) (emphasis added). Many similar letters and advertisements are also cited. Florida Sugar also cites multiple eighteenth century state statutes that use "import" and "export" in the context of interstate commerce, such as a 1785 Maryland statute that imposed "duties on certain enumerated articles *imported into* and *exported out of* this state." 1784 Ma-

ryland Laws, ch. 84, § I (emphasis added). Finally, Florida Sugar cites evidence of similar usage from the Articles of Confederation, and the Constitutional Convention. In the case of the former, Florida Sugar quotes a proposed amendment to the Articles of Confederation that would have vested power in Congress to "lay [ ] such imposts and duties upon imports and exports, as may be necessary for the purpose" of "regulating trade of the States, as well as with foreign nations, as with each other." Appellant's Brief at 17 n. 36 (citing 28 Journals of the Continental Congress, Mar. 28, 1785, p. 201, and *Camps Newfound,* 520 U.S. at 628, 117 S.Ct. 1590). At the Constitutional Convention, Florida Sugar reports that in relation to the Export Clause, James Madison recorded:

> Mr. Mercer was strenuous against giving Congress power to tax exports. Such taxes are impolitic, as encouraging the raising of articles not meant for exportation. The states had now a right, where their situation permitted, to tax both the *imports and exports of their uncommercial neighbors.*

Appellant's Brief at 20 (citing *Debates on the Adoption of the Federal Constitution Vol. 5* 433–34 (J. Elliot, ed., J.S. Lipincott, 1896) (emphasis added)).[2]

While the evidence assembled by Florida Sugar may be more than adequate to demonstrate a usage, especially in common, lay contexts, of the term "export" at the time the Constitution was drafted, we do not find it persuasive in proving the meaning the Framers intended for the precisely and carefully crafted clauses of the Constitution itself. As a mere glance at any modern newspaper reveals, the same word can have different meanings in different contexts and is frequently given a

---

**2.** Appellant has assembled an impressive collection of advertisements, news articles and state statutes, as well as some excerpts from debates of the Continental Congress and the Constitutional Convention, indicating that "export" was often understood to include a shipment from one state to another in the

eighteenth century. The recitation of evidence is far too lengthy to reproduce here in its entirety, so we have included some representative examples. The dissent in *Camps Newfound* recites a similar collection of evidence. *See Camps Newfound,* 520 U.S. at 623, 117 S.Ct. 1590.

broader definition in common, lay usage than one sees in legal instruments. More recent usages of "export" cited in Florida Sugar's own brief demonstrate this point. For example, recent newspaper articles refer to New York "exporting the city's trash" to Virginia.[3] Nevertheless, today the *legal* definition of export is generally understood to refer solely to foreign commerce. *See, e.g., Black's Law Dictionary* 579 ("Export, v. To carry or to send abroad. To send, take, or carry an article of trade or commerce out of the country ... Exports, n. Products manufactured in one country and then shipped and sold in another."). Despite this departure from generally accepted legal and economic definitions, the meaning of the term "export" in the cited newspaper articles is clear to readers—New York City's trash is being sent to Virginia for disposal. Similarly, the use of "export" in other articles on the same day in the same newspaper unquestionably refers to the international sale of goods.[4] We find usage in eighteenth century newspaper advertisements, articles, or state statutes no more helpful in interpreting the intended meaning of the word "export" in the Constitution than a modern-day *New York Times* article about trash shipments would be in interpreting the meaning of "export" in the HMT statute at issue in this case. Records from the Constitutional Convention, however, are much more persuasive.

Convention debate records reveal that the Export Clause arose in response to sectional differences dividing the former colonies. The Northern delegates, opposed to slavery, objected to the continued importation of slaves from Africa and to the Southern states' proposal for counting slaves in the apportionment of congressional representatives. In response, the Northern delegation advocated the possibility of a tax on foreign exports. James Madison reports, for example, that Rufus King of Massachusetts argued: "If slaves are to be imported shall not the exports produced by their labor, supply a revenue the better to enable the. Genl. Govt. to defend their masters.... At all events, either slaves should not be represented or exports should be taxable." *Records of the Federal Convention of 1787, Vol. II* 220 (Madison, Aug. 8) (Max Farrand, ed.) (hereinafter, "*Records of the Federal Convention*"). According to historians, the South "feared that possession of [the power to tax exports] by Congress would enable the North to discriminate against it, by a tax which would operate only on the peculiarly Southern articles of export," specifically the cash crops of tobacco, rice and indigo. Charles Warren, *The Making of the Constitution* 572 (1993); *see also* Christopher Collier & James Lincoln Collier, *Decision in Philadelphia: The Constitutional Convention of 1787* 166 (1986).

Our examination of the records of these debates about the Export Clause and the importation of slaves reveals that the delegates to the Constitutional Convention were referring only to foreign exports. For example, in arguing in favor of granting Congress the power to tax such exports James Madison said, "[a] proper regulation of exports may [and] probably will be necessary hereafter, and for the same purpose as the regulation of—imports; ... procuring equitable regulations *from other nations.*" *Records of the Federal Convention* 361 (Madison, Aug. 21) (quoting James Madison) (emphasis added). *See also* Warren, *supra* 572 (reporting that delegates to the Constitutional Convention argued that the power to tax exports

---

**3.** Bruce Lambert, *Giuliani Explains Why Others Should Take City's Trash*, New York Times, Jan. 14, 1999, A19; *see also* Eric Lipton, *Five States Challenge New York's Trash Plan*, Washington Post, Feb. 7, 1999, cited in Appellant's Brief at p. 21 n. 44.

**4.** Sam Dillon, *Turmoil In Brazil: The Ripple Effects*, New York Times, Jan. 14, 1999, C5;

Michael M. Weinstein, *Turmoil in Brazil: The Mistakes*, New York Times, Jan. 14, 1999, C1; Edward Wyatt, *Wall Street Recoils From Brazil's Turmoil, Then Collects Itself*, New York Times, Jan. 14, 1999, C1; Larry Rohter, *Turmoil In Brazil: The Overview; Brazil Devalues Its Currency 8%, Roiling Markets*, New York Times, Jan. 14, 1999, A1.

would be "more effectual than that over imports in obtaining beneficial *treaties* of commerce" (emphasis added)). Similarly, a delegate arguing in favor of the Export Clause declared

> The case of Exports was not the same with that of imports. *The latter were the same throughout the states:* the former very different. As to Tobacco *other nations* do raise it, and are capable of raising it as well as [Virginia] & c. The impolicy of taxing that article had been demonstrated by the experiment of Virginia.

*Records of the Federal Convention* 363 (Madison Aug. 21) (quoting George Mason) (emphasis added). For the "imports" in question to be "the same" throughout the states, they must be items imported from foreign countries. As the various states had different principal items of production, the delegates would not have referred to shipments from sister states as being "the same."

In a similar vein, another delegate discussing the clause noted that "Pennsylvania exports the produce of Maryd. N. Jersey, Delaware...." *Records of the Federal Convention* 362 (Madison, Aug. 21) (quoting James Wilson). In that instance, it appears that the delegate intended the verb "exports" to refer to foreign commerce, for a reference to interstate commerce would discuss Pennsylvania's "importation" of produce from Maryland, etc. Similarly, with regard to the portion of the Constitutional Convention debate cited by Florida Sugar, referencing the states' right "to tax both the *imports and exports of their uncommercial neighbors,*" it appears that "uncommercial" states was a reference to states without seaports. Thus, the exports discussed in that quote were actually exports to foreign countries from landlocked states being shipped via states with seaports.

As discussed above, the debate over the Export Clause and that concerning the importation of slaves and the counting of slaves in the apportionment of seats in Congress were closely intertwined. The *Records of the Federal Convention* indicates that the draft entrusted to the "Committee of Style" also treated the two clauses as linked. In that draft, Article VII, § 4 included, in the same paragraph, the Export Clause and a clause permitting the continued importation of slaves and authorizing an import tax on slaves of up to ten dollars.[5] In debating whether the Constitution should prohibit the importation of slaves, the Southern delegates asserted that such a bar would unduly advantage Virginia, which had a population of slaves that "exceeded the call for their services," by "creating a monopoly in [its] favor" and allowing it to "name [its] own terms" in the sale of slaves to other Southern states that required more slaves. *Id.* at 378 (McHenry, Aug. 22). If a bar on importation would advantage Virginia, then sale of a slave from Virginia to Mississippi would not be considered an "import." Thus, in the draft sent to the Committee on Style, the other clauses in the same paragraph as the Export Clause dealt only with foreign commerce. The grouping of these clauses together indicates that the Framers saw the clauses as interrelated and addressing similar subject matter, namely international commerce.

Finally, the North–South divide on the Export Clause itself provides strong evidence that the tax being discussed was one on shipments in foreign commerce alone. Because the Southern cash crops were sold overseas and had less competition on the world market, they were attractive targets for an export tax. *See, e.g.,* Warren, *supra* at 572 ("The South, being agricultural and having three great crops *which grew nowhere else,* ... feared that the possession of this power by Congress would enable

---

**5.** "The migration or importation of such persons as the several States now existing shall think proper to admit shall not be prohibited by the Legislature prior to the year 1808—but a tax or duty may be imposed on such importation not exceeding ten dollars for each person." *Records of the Federal Convention* 571 (Committee of Style).

the North to discriminate against it, by a tax which would operate only on the peculiarly Southern articles of export." (emphasis added)). More importantly, a significant portion of the industrial output of the North was not exported to foreign countries at all, but sold within the United States. *See, e.g.,* Joint Appendix at 121 (table prepared by appellants showing annual overseas export of the Southern colonies in 1768–72 at 1765 pounds sterling, while New England and the Mid–Atlantic colonies' overseas exports were 1036 pounds annually. The latter's sales to other North American colonies were 524 pounds compared to 191 for Southern colonies.) (citing, J. Shepard & S. Williamson, "The Coastal Trade of the British North American Colonies, 1768–1772," *J. of Econ. History,* Vol. XXXII, No. 4, p. 783). A tax on interstate shipments would thus prejudice the North as well as the South, whereas a tax on exports to foreign countries was more likely to threaten mainly the South because the South both exported more and had exports that were unique and thus more amenable to taxation. During the Constitutional Convention it was the Southern states that insisted on the continuation of slavery and a ban on export taxes, while the Northern delegates generally sought to protect the ability of the federal government to raise money from taxation on exports. *See* Warren, *supra* at 574. For the tax under debate to have disproportionately injured the South, it could not have been a tax on interstate commerce. The vigorous opposition of the Southern delegates to the tax is thus evidence that the tax being discussed was a tax on shipments to foreign countries.

Having reviewed the debates carefully, we conclude that the Framers were consistently using "export" in a foreign commerce context when they drafted and debated the Export Clause.

## B.

■ Like clauses in a statute, related clauses of the Constitution should be interpreted to avoid contradictions in the text or the rendering of some part of the text superfluous. *Cf. Regions Hospital v. Shalala,* 522 U.S. 448, 466–67, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) ("It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word .... 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times.") (*quoting Market Co. v. Hoffman,* 101 U.S. 112, 115–16, 25 L.Ed. 782, (1879)). Reading the Export Clause in light of other clauses of the Constitution provides additional indications that the Framers intended it only to limit federal powers with regard to foreign commerce.

Interpreting the Export Clause as Florida Sugar urges creates an inconsistency in the clauses of the Constitution. As Chief Justice Miller pointed out in *Woodruff v. Parham,* 75 U.S. (8 Wall.) 123, 132, 19 L.Ed. 382 (1868), "no article can be imported from one state into another which is not, at the same time, exported from the former." In other words, a ban on taxing "exports" from one state to another would necessarily ban taxes on any interstate shipment. Thus, extension of the Export Clause prohibition to interstate commerce would seem to limit severely the powers granted to the federal government in the Commerce Clause. *See* U.S. Const. Art. I, § 8, cl. 3 (Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several states, and with Indian Tribes."). The power to regulate commerce with foreign nations is not completely curtailed by the bar on export taxes, as the federal government may still tax imports. In the case of interstate commerce, however, imports and exports are two sides of the same coin; thus, a bar on taxing "exports" from one state to another necessarily bars taxing "imports" into one state from another, thereby eliminating any federal government power to tax interstate commerce.

Furthermore, the Export Clause only proscribes the activities of the federal government and thus must be viewed in that context. As Justice Thomas explains in his *Camps Newfound* dissent, "the word import derived its meaning from the jurisdiction into which goods were imported." *Camps Newfound,* 520 U.S. at 625, 117 S.Ct. 1590. The same reasoning applies equally to the word "export." An "export" must necessarily originate from one jurisdiction and terminate in another jurisdiction. Thus, when interpreting the scope of the meaning of the word "export" anywhere in the Constitution, we must look to the relevant jurisdiction, which, in the case of the Export Clause, is the federal government. The Export Clause only limits the federal government; thus the jurisdiction of origin is "any state" within the jurisdiction of the federal government. It follows, then, that to terminate in another jurisdiction (as it must, to be considered an "export") the destination of the shipment must be outside the jurisdiction of the federal government, namely a foreign country. For the same jurisdiction-based reasons, we find Florida Sugar's citations to eighteenth century state statutes less than persuasive.

Finally, the clause immediately following the Export Clause provides that "No preference should be given any Regulation of Commerce or Revenue to the Ports of one State over another: nor shall vessels bound to or from one state, be obliged to enter, clear, or pay Duties in another." U.S. Const., Art. I, § 9, cl. 6. Similarly, Art. I, § 8, cl. 1 of the Constitution requires that "all Duties, imposts and Excises shall be uniform throughout the United States." These clauses protect against the federal government discriminatorily taxing the interstate commerce of a particular state or region. Thus, the argument that the evil sought to be prevented by the Export Clause is discrimination resulting from taxation of interstate commerce is even less persuasive in light of the other, more specific protections against such discrimination found elsewhere in the Constitution. *Cf. Dooley v. United States,* 183 U.S. 151, 157, 22 S.Ct. 62, 46 L.Ed. 128 (1901) ("While [a tax on merchandise carried from one state to another] does not seem to be forbidden by the express words of the Constitution, it would be extremely difficult, if not impossible to lay such a tax without a violation of the 1st paragraph of art. 1, § 8."). Concededly, neither of these clauses prevents a uniform, nationwide tax on goods unique to the South that could be used to raise money in a way that discriminated against the South. Such a nationwide tax, similar to the current federal taxes on cigarettes and gasoline, is not prohibited by the Constitution as such a uniform tax on goods simply is not considered a tax on "exports," however defined. *Cf. Pace v. Burgess,* 92 U.S. 372, 374, 23 L.Ed. 657 (1875) (reciting that "[a]n excise tax of thirty-two cents per pound was imposed on all manufactured tobacco .... tobacco intended for export was excepted" and holding that requiring a nominal fee for a stamp designating export-tobacco was not a violation of the Export Clause); *United States v. Hvoslef,* 237 U.S. 1, 13, 35 S.Ct. 459, 59 L.Ed. 813 (1915) ("[The Export Clause] is designed to give immunity from taxation to property that is *in the actual course of such exportation.*" (emphasis added)). Thus, the only possible domestic tax on exports barred by Florida Sugar's interpretation of the Export Clause would be one, such as we have here, that taxes the movement of goods between United States ports across state borders. The above-quoted constitutional clauses would require that any such tax be uniform across the United States. A uniform tax on shipments across state borders would not result in the sort of discrimination that the Southern delegates were resisting during the Constitutional Convention. Indeed, such a tax would place an equal burden on Northern products, which had larger domestic markets than Southern products.

When viewed in the context of the Convention debates and the entirety of the relevant constitutional text, we see strong indicators that the Constitution's drafters

intended only to prohibit taxes on foreign commerce, not interstate shipments. We view the evidence from the debates as more persuasive than the general evidence about usage under the Articles of Confederation, in state statutes, or in articles or advertisements in newspapers of the day. Accordingly, we conclude that the Framers intended the Export Clause to prohibit only taxes on shipments to foreign countries. As the discussion below reveals, our view appears consistent with statements by the Supreme Court.

## II.

A long line of Supreme Court decisions appears to assume that the Export Clause applies only to goods shipped to a foreign country. Nevertheless, Florida Sugar is correct in its assertion that none of these cases even addresses, much less definitively resolves, the question before this court. Florida Sugar further argues that the dicta in the Supreme Court cases viewing the Export Clause as applying only to foreign commerce is, in fact, incorrect. We look first to the Supreme Court's Export Clause decisions and then address Florida Sugar's arguments that focus on Import/Export Clause jurisprudence. In light of the consistent Supreme Court dicta on the question, our analysis of the text and the intent of the Framers, *ante*, we reject Florida Sugar's assertion.

## A.

The Export Clause cases all rely on *Woodruff*, which interpreted the Import/Export Clause as

> refer[ing] exclusively to foreign commerce. Its object as shown by the debates, was to secure those States, which from geographical position, could not import for themselves, from the exercise of the taxing power of the States whose ports they would be compelled to use.

75 U.S. at 128 (citing Madison Papers, 3d vol. 1445). Although *Woodruff* does not actually interpret the Export Clause, it has been widely cited in Export Clause cases.

In *Dooley*, the first case that addressed the breadth of the Export Clause, the Supreme Court referenced the *Woodruff* decision in upholding a federal statute that imposed duties on merchandise imported into Puerto Rico from New York. The *Dooley* Court reasoned that the Export Clause applied only to foreign commerce, stating "[i]f, then Porto [sic] Rico be no longer a foreign country under the Dingley act ... we find it impossible to say that goods carried from New York to Porto [sic] Rico can be considered as 'exported' from New York within the meaning of the Constitution." *See* 183 U.S. at 154, 22 S.Ct. 62. The Court, however, decided the *Dooley* case on two alternative grounds, the second and crucial being that the tax was actually an *import* tax on goods imported *into* Puerto Rico, legislated by the Congress acting essentially in the capacity of the Puerto Rican legislature. *See id.* at 155–56, 22 S.Ct. 62. Thus the Court did not explicitly rely on its interpretation of the Export Clause as the ground for its decision, stating in the end:

> It is not intended by this opinion to intimate that Congress may lay an export tax upon merchandise carried from one state to another. While this does not seem to be forbidden by the express words of the Constitution, it would be extremely difficult, if not impossible, to lay such a tax without a violation of the 1st paragraph of art. 1, § 8 that "all duties, imposts, and excises shall be uniform throughout the United States." ... *The question, however, is not involved in this case, and we do not desire to express an opinion upon it.*

*Dooley*, 183 U.S. at 157, 22 S.Ct. 62 (emphasis added); *see also Hooven & Allison v. Evatt*, 324 U.S. 652, 679 n. 5, 65 S.Ct. 870, 89 L.Ed. 1252 (1945) (stating that interpretation of the Export Clause was not necessary for the *Dooley* decision). The authority of the *Dooley* decision is perhaps further undermined by the fact that it was a split decision, with three other justices joining a dissent by Chief Justice Fuller, concluding that the Export

Clause indeed applied to interstate shipments. *See Dooley*, 183 U.S. at 172, 22 S.Ct. 62 ("[Limiting the Export Clause to foreign commerce] would defeat the manifest purpose of the Constitution by enabling discriminating taxes and duties to be laid against one section of the country as distinguished from another."). Despite these weaknesses, the *Dooley* Court's dicta with regard to the Export Clause has not been questioned or weakened by subsequent Supreme Court cases interpreting the Export Clause.

The *Dooley* interpretation of the Export Clause was reiterated in *Hvoslef*, in which the Supreme Court stated:

The constitutional provision that "no tax or duty shall be laid on articles exported from any state" has been the subject of elaborate and authoritative exposition, and we need but apply the principles of construction which have been settled by previous decisions.... *The prohibition relates only to exportation to foreign countries* ... and is designed to give immunity from taxation to property that is in the actual course of such exportation.

*Id.*, 237 U.S. at 13, 35 S.Ct. 459 (citations omitted) (emphasis added). That case, however, involved a claim for refund of a tax on "the carriage of cargo from state ports to foreign ports," *id.*; thus, the tax was unquestionably directed at foreign exports. Accordingly, the Supreme Court's declaration in *Hvoslef* that the prohibition in the Constitution related "only to exportation to foreign countries," *id.*, was, like the alternative *Dooley* holding, unnecessary to the decision.

More recently, in *United States v. International Business Machines*, the Supreme Court stated, the "Export Clause ... specifically prohibits Congress from regulating *international commerce* through export taxes." 517 U.S. 843, 859, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (emphasis added). Like the *Hvoslef* decision, however, *International Business Machines* addressed a statute expressly aimed at foreign exports, and thus the limitation of the

Export Clause to international commerce was not necessary to the decision.

## B.

Florida Sugar also argues that the subsequent cases undermine the Export Clause dicta of *Dooley*. Prior to *Woodruff*, the Import/Export Clause was interpreted as restricting the states' powers to tax interstate shipments. *See, e.g., Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 449, 6 L.Ed. 678 (1827) (striking down a law requiring importers from foreign countries to get a license and declaring, in dicta, that "we suppose the principles laid down in this case to apply equally to importations from a sister state"); *Almy v. California*, 65 U.S. (24 How.) 169, 173–74, 16 L.Ed. 644 (1861) (finding a tax on documents involved in a shipment from San Francisco to New York to be a violation of the Import/Export Clause). The *Woodruff* holding, however, is clear; thus we are not swayed by Florida Sugar's citation to *Brown* or *Almy*, which must be deemed superseded by *Woodruff*.

Florida Sugar also relies heavily on a recent challenge to the *Woodruff* holding in a dissent by Justice Thomas. Joined by Justice Scalia, Justice Thomas calls into question the legal rationale of *Woodruff*. *See Camps Newfound*, 520 U.S. at 609, 117 S.Ct. 1590. While a dissent carries no precedential weight, we discuss it here because it forms so central a part of Florida Sugar's argument.

Justice Thomas's *Camps Newfound* dissent questions the Court's dormant Commerce Clause jurisprudence, arguing that the Import/Export Clause should have been read to prohibit states from levying taxes on goods imported from or exported to other states. Such a reading of the Import/Export Clause would have rendered the dormant Commerce Clause jurisprudence unnecessary. To that end, Justice Thomas criticizes the *Woodruff* holding that the Import/Export Clause applies only to foreign commerce. The Thomas dissent, however, does not address

the Export Clause at all and thus can hardly provide reason to question the Supreme Court's Export Clause jurisprudence. Furthermore, in *International Business Machines*, the Court, with Justice Thomas writing, cautioned that Import/Export Clause jurisprudence is not interchangeable with Export Clause jurisprudence as the terms of the clauses have different meanings. *See* 517 U.S. at 857, 116 S.Ct. 1793 ("Though we have frequently interpreted the Clauses together . . . our more recent . . . cases . . . caution that meaningful textual differences should not be overlooked."). Furthermore, Justice Thomas's opinion in *International Business Machines* states that the Export Clause "specifically prohibits Congress from regulating *international* commerce through export taxes." *Id.* at 859, 116 S.Ct. 1793 (emphasis added). Thus, we have no reason to suspect that either of the dissenting justices in *Camps Newfound* would support Florida Sugar's proposed interpretation of the Export Clause.

Aside from the dissent in *Dooley*, appellant cites no Supreme Court case suggesting that the Court would interpret the Export Clause to apply to interstate commerce. The best evidence that Florida Sugar can marshal for its position is apparently ancient case law on the Import/Export Clause that has been overruled and a dissent discussing the Import/Export Clause in the context of dormant Commerce Clause jurisprudence. Accordingly, we do not find relevant, much less persuasive, Florida Sugar's lengthy discussion of the Import/Export Clause, particularly the dormant Commerce Clause discussion in the *Camps Newfound* dissent.

## CONCLUSION

■ The reports from the Constitutional Convention, historical analyses of the drafting efforts, and our own review of the Export Clause in the context of several related constitutional clauses, reveal that the Framers intended only to deny the federal government power to impose taxes on exports from the United States to for-

eign countries. In addition, while there is no Supreme Court precedent directly on point, the alternative ground for decision given in *Dooley* and the dicta in both *Hvoslef* and *International Business Machines* provide this court with consistent guidance from the Supreme Court indicating that the Export Clause cannot logically be interpreted to ban federal taxes on interstate shipments from one port to another. Accordingly, we hold that the Export Clause does not prohibit federal taxes on interstate shipments and thus does not block the application of the HMT to Florida Sugar's shipments between ports in different states. Taxes collected from Florida Sugar were not constitutionally prohibited and so no refund is due, as the trial court correctly held. Consequently, dismissing the action was not error. We therefore,

*AFFIRM.*