ONTARIO POWER GENERATION,
INC., Plaintiff,

v.

The UNITED STATES, Defendant,

v.

Mingo Logan Coal Co., et al.,
Third-party Defendants.

No. 00–761T.

United States Court of Federal Claims.

Dec. 13, 2002.

Richard J. Gagnon and Stephen J. Marzen, Sherman & Sterling, Washington, D.C., for the plaintiff.

Robert C. Stoddart, U.S. Department of Justice, Washington, D.C., with whom was Mildred L. Seidman, U.S. Department of Justice, for the defendant.

Anthony S. Gasaway, Bryan Cave, LLP, St. Louis, Missouri, for third-party defendants Mingo Logan Coal Co., Ashland Coal, Inc. and Arch Coal Sales, Inc.

## OPINION

ALLEGRA, Judge.

Plaintiff is a state-owned Canadian power generating corporation that purchased millions of tons of U.S. coal in the six years leading up to the filing of this action. The price that plaintiff paid for that coal included the cost of the coal excise taxes imposed under 26 U.S.C. § 4121(a) and reclamation fees imposed under 30 U.S.C. § 1232. Plaintiff brings this action to recover these

amounts as an illegal exaction in violation of the Export Clause of the Constitution. Defendant and the third-party defendants have moved to dismiss the complaint arguing, *inter alia*, that plaintiff lacks standing to assert this claim. Following oral argument and after careful consideration of the parties' filings, this court hereby **GRANTS** this motion to dismiss.

## I. Facts [1]

Ontario Power Generation ("OPG" or plaintiff) is a corporation owned by, and organized under the laws of, the province of Ontario, Canada. OPG was the ultimate purchaser and user of coal purchased from various U.S. suppliers during the years in question. Plaintiff claims that these suppliers collected from it, by including in the price of the coal, the Black Lung Excise Tax required by 26 U.S.C. § 4121 (the Coal Tax), as well the reclamation fee required by 30 U.S.C. § 1232. OPG alleges that it, in effect, paid the Coal Tax and reclamation fee, averring further that this tax and fee, insofar as they applied to their transactions, violated the Export Clause of the Constitution, Article I, § 9, cl. 5.

Plaintiff filed its original complaint in this case on December 15, 2000. On July 31, 2001, it amended that complaint, seeking recovery of both the Coal Tax and reclamation fees, alleging that both "have been illegally exacted from plaintiff in contravention of the Export Clause."

On October 18, 2001, the United States filed a motion for judgment on the pleadings and for dismissal. Defendant's motion challenges both plaintiff's standing to bring an action to recover with respect to the Coal Tax and the jurisdiction of this court to hear plaintiff's claim regarding the reclamation fees. On March 5, 2002, Mingo Logan Coal Co., Ashland Coal, Inc., and Arch Coal Sales, Inc., collectively filed a motion for judgment on the pleadings and for dismissal of OPG's complaint (the third parties' motion).[2] Alliance Coal LLC and Seascape Coal Sales, Inc. were later granted permission to join the third parties' motion. Oral arguments on the two motions—those of the United States and the third parties—were conducted on September 12, 2002.

## II. Discussion

■ Today, this court filed an opinion and order in *Emerald International Corp. v. United States*, 54 Fed.Cl. 674 (2002), granting the defendant's motion for summary judgment and dismissing the complaint therein. In that case, this court held that a domestic coal broker, who purchased coal for purposes of resale to various international customers, lacked constitutional standing to assert a damage claim under the Export Clause. This court further held Emerald could not pursue a recovery under the Tucker Act on several other theories: (i) as a takings claim based upon the Fifth Amendment; (ii) an illegal exaction claim; and (iii) a claim based upon an implied contract.

In the court's view, *Emerald* disposes of all of the claims raised by Ontario in the case *sub judice*. While defendant does not, for purposes of this motion, challenge plaintiff's constitutional standing to bring Export

1. In reviewing the sufficiency of the complaint pursuant to a motion to dismiss, this court must presume that the factual allegations included in the complaint are true. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

2. By order dated June 8, 2001, this court directed the Clerk to give notice of this matter to all "persons" listed in an Appendix A attached to said order. The full style of this matter includes all 49 entities listed in this Appendix, but only six of these parties actually filed pleadings of some sort in this action. Four—Mingo Logan Coal Co., Ashland Coal, Inc., Arch Coal Sales, Inc. and Alliance Coal LLC—filed answers to plaintiff's complaint and have been listed as third-party defendants. Two—Seascape Coal Sales, Inc. and Riverton Coal Sales, Inc.—filed third-party complaints and have been listed as third-party plaintiffs. But, the answers and complaints filed by these third parties all essentially assert that they, and not plaintiff, are entitled to the taxes at issue. Some of these third parties have also filed separate lawsuits in this court, seeking to recover the same taxes at issue here. For ease of reference, the court will collectively refer to all these parties as "third-party defendants."

Clause claims, the third-party defendants do so and the court finds that challenge well-taken. This court concludes that the same standing deficiencies identified in *Emerald* are also patent here, principally, that plaintiff cannot show that any economic injury it suffered was fairly traceable to imposition of the Coal Tax or the reclamation fee on the producers participating in its transactions.[3] In the language of the Supreme Court, any such injury is not the result of the "determinative or coercive" effect of the imposition of the Coal Tax and the reclamation fee, but rather " 'the result of the independent action of some third party not before the court,' " *to wit*, the decision of the coal producers to "pass on" the burden of these exactions to their customers. *Bennett v. Spear*, 520 U.S. 154, 168–69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *See Emerald*, 54 Fed.Cl. at 677–83.

▮ Breaking new ground, the court also finds that OPG, as a foreign consumer of coal, fails to meet prudential standing requirements. According to the Supreme Court, the prudential standing question is "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In more familiar terms, the issue is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90

S.Ct. 827, 25 L.Ed.2d 184 (1970). While this test, at least in some contexts, is "not meant to be especially demanding," *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987),[4] the Supreme Court has, nonetheless, made clear that standing should be denied, on prudential grounds, where plaintiffs are "merely incidental beneficiaries" of the statutory or constitutional provision at issue. *National Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 494 n. 7, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *see also Clarke*, 479 U.S. at 399, 107 S.Ct. 750; *McKinney v. U.S. Department of the Treasury*, 799 F.2d 1544, 1551–52 (Fed.Cir.1986). Finally, none of the parties disputes that these prudential standing requirements may be applied in this court in cases brought under the Tucker Act, a conclusion that seemingly flows from the numerous cases that have applied Article III constitutional standing principles to this court. *See Emerald*, 54 Fed.Cl. at 677 & n. 5.

▮ For our purposes, the question then is whether plaintiff's interests are arguably within the "zone of interests" to be protected by the Export Clause. That clause provides that "[n]o Tax or Duty shall be laid on Articles exported from any State." U.S. Const. Art. I, § 9, cl. 5. Plaintiff claims that its interests are within the relevant zone because the Clause was adopted to "protect international free trade." Defendant, joined by the intervening defendants, disagrees and retorts that "[t]he U.S. Constitution ... is not a draft version of GATT: the Framers did not intend to benefit foreign purchasers."

---

3. Similarly to the Coal Tax, the liability for paying the reclamation fee falls on the operators of the coal mines. Thus, 30 U.S.C. § 1232, states that "[a]ll operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior ..." For purposes of the reclamation fee, an "operator" is "any person ... engaged in coal mining who removes ... more than 250 tons of coal by mining within 12 consecutive calendar months in any one location." 30 U.S.C. § 1292(13).

4. In *Clarke*, the Supreme Court suggested that the "zone of interests" test is most forgiving in

the context of the " 'generous review provisions' " of the Administrative Procedures Act, 479 U.S. at 400 n. 16, 107 S.Ct. 750 (quoting *Data Processing*, 397 U.S. at 156, 90 S.Ct. 827). The Court, nonetheless, indicated that the "zone of interests" inquiry remains relevant outside the APA context, albeit in a narrower fashion and with the possibility that other factors may be relevant in considering prudential standing. 479 U.S. at 400 n. 16, 107 S.Ct. 750. For the reasons that follow, this court does not believe that any of these nuances in the "zone of interests" test are determinative here.

The court concludes that plaintiff's interests plainly do not fall within the zone of interests protected by the Export Clause. While the language of that clause is inconclusive on this count, its context within the Constitution is telling. The Export Clause falls within section 9 of Article I of the Constitution, which section, with its eight clauses, generally was designed to limit the powers granted to Congress and thereby strike an appropriate balance of power between the States and the Federal Government. That the Export Clause was not intended broadly to promote free trade is apparent from Article I, § 10, cl. 2 of the Constitution, which allows the States, with congressional approval, "to lay any Imposts or Duties on Imports or Exports." Thus, the Constitution "left to the states a greater power over exports than congress had, for by the ninth section of the first article, they were prohibited from taxing exports, without any qualification, even by the consent of the states; whereas, with the consent of congress, any state can impose such a tax by law, subject to the conditions prescribed." *Mayor, Aldermen and Commonalty of New York v. Miln,* 36 U.S. 102, 11 Pet. 102, 9 L.Ed. 648 (1837) (Baldwin, J., concurring).[5] Moreover, nothing in the Constitution prohibits Congress from taxing *imports,* a concept that prominent commentators view as even more antithetical to free trade. *See, e.g.,* 1 Bruce E. Club, United States Foreign Trade Law lxii (1991). Contrary to plaintiff's importunings, then, the Constitution neither entirely proscribes the taxation of exports nor generally forbids the Federal taxation of imports at all, leading this court to reject plaintiff's claim that the buckler of the Export Clause was to be wielded by foreign purchasers to protect free trade. *See Florida Sugar Marketing and Terminal Ass'n v. United States,* 220 F.3d 1331, 1335–37 (Fed.Cir.2000).[6]

Plaintiff, however, cites that portion of *United States v. Hvoslef,* 237 U.S. 1, 15, 35 S.Ct. 459, 59 L.Ed. 813 (1915), in which the Supreme Court stated that "the purpose of the [Export Clause] is that exportation, all exportation, shall be free from national burden." Viewed in context, however, this quote merely refuted the contention that "there should be enforcement [of the Export Clause] only so far as necessary to prevent ... discrimination" between or among the States. 237 U.S. at 15, 35 S.Ct. 459. Indeed, while the court is mindful of the need to avoid converting the prudential standing analysis into a full blown consideration of the merits, it remains that countless decisions have described the purpose of the Export

**5.** Justice Henry Baldwin actually published his concurring opinion in a supplementary volume entitled, *A General View of the Origin and Nature of the Constitution and Government of the United States ... Together with the Opinions in the Cases decided at January Term, 1837, Arising on the Restraints on the Powers of the States* (1837). According to two commentators, this "anomaly [arose] in part from [Court reporter] Peter's poor relations with Justice Baldwin" and the justice's inability to finish his opinions in time for publication. Morris L. Cohen & Sharon H. O'Connor, A Guide to the Early Reports of the Supreme Court 70 (1995).

**6.** It appears from the convention debates, that opponents of the Export Clause, among them, James Madison, were fearful that adoption of the clause ultimately would inhibit free trade, by preventing the United States from negotiating favorable treaties. *See 2 The Records of the Federal Convention of 1787* 361 (Max Farrand ed.1966) (quoting James Madison on Aug. 21); *see also Florida Sugar,* 220 F.3d at 1335–36; Note, Constitutionality of Export Controls, 76 Yale L.J. 200, 202 (1966) (In adopting the clause, "the Convention was aware that it was depriving the new government of a tool for both domestic and foreign commercial policy."). Indeed, a review of Madison's notes of the debates on the Export Clause, which occurred primarily on August 16 and 21, 1787, reveals not the slightest concern about foreign consumers or free trade among either proponents or opponents of the provision. *See 2 The Records of the Federal Convention of 1787* 304–310 (Max Farrand ed.1966). Typical of the views expressed by the proponents were those of Mr. Elseworth, who is reported by Madison to have stated that—"There are solid reasons against. Congs. taxing exports. 1. it will discourage industry, as taxes on imports discourage luxury. 2. The produce of different States is such as to prevent uniformity in such taxes. There are indeed but a few articles that could be taxed at all; as [tobacco] rice & indigo, and a tax on these alone would be partial & unjust. 3. The taxing of exports would engender incurable jealousies." *Id.* at 360; *see also* 1 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1013–15 (5th ed., 1905) (summarizing the debates).

Clause only in domestic terms, as preventing Congress from giving an advantage to the ports and commerce of one state, by prohibiting Congress from taxing exports at all.[7] For example, *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed.Cir.2000), the case upon which plaintiff principally relies, states that "the Framers intended the Export Clause to allay the fears of certain States that they would bear a greater tax burden due to differing levels of exportation." *Id.* at 1373–74. Conversely, in no case cited by plaintiff or otherwise found has this clause been successfully invoked by a foreign entity seeking to overturn a tax or a duty.[8] While foreign purchasers undoubtedly stand to benefit incidentally from this constitutional protection, that does not mean that they are among the direct beneficiaries thereof—and the latter is controlling for purposes of determining whether a given individual is within the requisite "zone of interests." *See Warth*, 422 U.S. at 510, 95 S.Ct. 2197 (explaining the "incidental congruity of interest" is insufficient to confer standing); *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d 130, 143 (D.C.Cir.1977) (a mere "congruence between the purpose of the statute .. and the interests asserted by [a plaintiff] is not sufficient to invoke the federal judicial power").

Based on the foregoing, this court concludes that plaintiff is not arguably within the zone of interests protected by the Export Clause and thus lacks prudential standing to bring any claims predicated upon that clause. This conclusion draws further support from cases which indicate that another consideration in assessing prudential standing is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197. Here, plaintiff is essentially asserting the rights of the coal producers, upon whom the exactions in questions were actually imposed. Of course, it is well-accepted that the Congress, may if it wishes, expressly override prudential considerations of standing and authorize the filing of a law suit. *See Bennett*, 520 U.S. at 162–63, 117 S.Ct. 1154. But, this court sees no evidence of this here. *Per contra.* The case law suggests that plaintiff's illegal exaction claim fails to state a claim under the Tucker Act. *See Casa De Cambio Comdiv S.A., De. C.V. v. United States*, 291 F.3d 1356 (Fed.Cir.2002), *aff'g*, 48 Fed.Cl. 137 (2000). This, indeed, was the conclusion of this court on analogous facts in *Emerald*, 54 Fed.Cl. at 684.[9]

---

7. See *United States v. United States Shoe Corp.*, 523 U.S. 360, 368, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998) (" '[T]he Framers sought to alleviate ... concerns [that Northern States would tax exports to the disadvantage of Southern States] by completely denying to Congress the power to tax exports at all.' " (quoting *United States v. Int'l Bus. Machines Corp.*, 517 U.S. 843, 861, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (alternations in original))); *Int'l Bus. Machines*, 517 U.S. at 848, 116 S.Ct. 1793 ("We know historically that [the Export Clause] was one of the compromises which entered into and made possible the adoption of the Constitution. It is a restriction on the power of Congress ...." (quoting *Fairbank v. United States*, 181 U.S. 283, 290, 21 S.Ct. 648, 45 L.Ed. 862 (1901))); *Florida Sugar*, 220 F.3d at 1338 (clause designed to "protect against the federal government discriminatorily taxing the interstate commerce of a particular state or region"); *Carnival Cruise Lines, Inc. v. United States*, 200 F.3d 1361, 1364 (Fed.Cir.), *cert. denied*, 530 U.S. 1274, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000) (same).

8. Several cases, in fact, suggest a general hesitancy by courts to afford foreign entities and

individuals standing to sue absent some indication from Congress that it intended a law with a domestic scope to be enforced by foreigners. See, e.g., *Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 815 F.2d 1488, 1491 (Fed. Cir.1987), *cert. denied*, 484 U.S. 924, 108 S.Ct. 285, 98 L.Ed.2d 245 (1987) (holding European manufacturer of steel pipe lacked prudential standing to challenge denial of its request to allow further importation of pipe, finding that "it does not appear that Congress intended to rely on foreign manufacturers to challenge administrative application of American import laws"); *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1209–11 (5th Cir.1991) (finding that Canadian workers, affected by the loss of sales due to the EPA's ban of asbestos under the Toxic Substance Control Act, did not have standing to challenge the action because of the Act's "national emphasis").

9. In *Ashkir v. United States*, 46 Fed.Cl. 438 (2000), this court held that a nonresident alien lacked standing to invoke the Takings Clause of the Fifth Amendment with respect to real property located in Somalia. The court found that neither the plaintiff nor his property possessed

## III. Conclusion

For these reasons, this court **GRANTS** defendant's motion to dismiss plaintiff's complaint for lack of standing. The Clerk is hereby ordered to dismiss plaintiff's complaint. On or before January 10, 2003, defendant and the third-party defendants shall file a joint status report with the court indicating how, if at all, they intend to proceed with respect to the third-party actions associated with this case.

the requisite substantial connection with the United States that would allow for his invocation of the Takings Clause. 46 Fed.Cl. at 444–45. Although this court intimated that a similar analysis might apply to other provisions of the Constitution, *id.* at 443, based on the foregoing, this court need not decide whether the analysis in *Ashkir* actually extends to the Export Clause.

Based on its resolution of the standing issue, this court also need not reach the issue whether it or the district courts has exclusive jurisdiction to consider plaintiff's challenge to the imposition of the reclamation fees. *But see Amerikohl Mining, Inc. v. United States,* 899 F.2d 1210 (Fed.Cir. 1990); *Consolidation Coal Co. v. United States,* 54 Fed.Cl. 14 (2002).