369 F.3d 1298
 ONTARIO POWER GENERATION, INC., Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee,
v.
Mingo Logan Coal Co., Ashland Coal, Inc., and Arch Coal Sales, Inc., Third party Defendants-Appellees, and
Alliance Coal LLC, Third party Defendant-Appellee.
 No. 03-5161.
 United States Court of Appeals, Federal Circuit.
 DECIDED: May 20, 2004.
 
 Richard J. Gagnon, Jr., Shearman & Sterling LLP, of Washington, DC, argued for plaintiff-appellant. On the brief was Stephen J. Marzen.
 Teresa E. McLaughlin, Attorney, Tax Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were Eileen J. O'Connor, Assistant Attorney General; and Judith A. Hagley, Attorney.
 B. Derek Rose, Bryan Cave LLP, of St. Louis, Missouri, argued for third-party defendants Mingo Logan Coal, Inc., et al. With him on the brief was Kenneth A. Kleban.
 William L. Anderson, Crowell & Moring LLP, of Washington, DC, for third-party defendant-appellee Alliance Coal, LLC. With him on the brief was John W. Borchert.
 Before MAYER, Chief Judge, SCHALL and DYK, Circuit Judges.
 MAYER, Chief Judge.
 
 
 1
 Ontario Power Generation, Inc. ("Ontario") appeals the judgment of the United States Court of Federal Claims, which dismissed Ontario's claims for the refund of taxes and reclamation fees for lack of standing. Ontario Power Generation, Inc. v. United States, 54 Fed.Cl. 630 (2002). Because we hold that jurisdiction is lacking, the judgment of the Court of Federal Claims is affirmed.
 
 
 Background
 
 
 2
 Ontario, a Canadian power company, has purchased, and consumed, several million tons of coal from U.S. suppliers. For each transaction, the U.S. suppliers paid coal excise taxes and reclamation fees to the United States government ("government") pursuant to 26 U.S.C. § 4121(a) and 30 U.S.C. § 1232, respectively. According to Ontario, the U.S. suppliers included an amount equal to these taxes and fees in the purchase price of the coal. As such, Ontario alleges that it, by way of its U.S. suppliers, effectively paid the relevant taxes and fees to the government. In an effort to obtain a refund, Ontario initiated this action in the Court of Federal Claims alleging that the taxes and fees violated the Export Clause of the United States Constitution, art. I, § 9, cl. 5. The government conceded that the coal excise tax and reclamation fees violated the Export Clause, but that Ontario lacked standing to obtain a refund because the U.S. suppliers paid the government. Therefore, according to the government, any harm to Ontario was caused by the U.S. suppliers' decision to pass the tax through, not by the government's once-removed decision to impose the tax. Several U.S. suppliers have been allowed to intervene, and claim that they are the appropriate parties to seek a refund because they paid the taxes and fees directly to the government.
 
 
 3
 The Court of Federal Claims held that Ontario lacked standing because any harm it suffered was not fairly traceable to (i.e., caused by) the government's imposition of the coal tax and reclamation fees. Ontario, 54 Fed.Cl. at 631-32. The court provided an alternate basis for its judgment, stating that Ontario was not within the zone of interest of the Export Clause and, therefore, failed to satisfy prudential standing requirements. Id. at 632-33. On appeal, Ontario claims that it has both constitutional and prudential standing. Ontario also argues that its claim was properly brought under the Tucker Act, the sole basis for jurisdiction alleged, because the government illegally exacted the taxes and fees.
 
 
 Discussion
 
 
 4
 We exercise jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review the judgment of the Court of Federal Claims to dismiss for lack of jurisdiction de novo. See James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed.Cir.1996).
 
 
 5
 The jurisdiction of the Court of Federal Claims in this case lies exclusively under the Tucker Act, 28 U.S.C. § 1491, which states,
 
 
 6
 The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 
 
 7
 The Tucker Act waives the sovereign immunity of the federal government. United States v. Mitchell, 463 U.S. 206, 216-17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). It does not, however, provide any substantive rights. Id. Therefore, in order to invoke the jurisdiction of the Court of Federal Claims under the Tucker Act, a plaintiff must also rely on a right to money damages found in the Constitution, a statute or a government regulation, or a contract. Id.
 
 
 8
 The underlying monetary claims are of three types. See United States v. Testan, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); Martinez v. United States, 333 F.3d 1295, 1303-03 (Fed.Cir.2003); Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 372 F.2d 1002, 1007-08 (1967). First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. See Fidelity & Cas. Co. v. United States, 203 Ct.Cl. 486, 490 F.2d 960, 967 (Ct.Cl.1974). Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S., 372 F.2d at 1007-08 (describing illegal exaction claims as claims "in which `the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct.Cl. 505, 117 F.Supp. 576, 580 (1954))); see also Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed.Cir.1996); City of Manassas Park v. United States, 224 Ct.Cl. 515, 633 F.2d 181, 183 (1980) (describing illegal exaction claims as claims for money "in Treasury coffers"). Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also Testan, 424 U.S. at 401-02, 96 S.Ct. 948 ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim — whether it be the Constitution, a statute, or a regulation — does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis `in itself ... can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute. See Martinez, 333 F.3d at 1302-03. As the source of its substantive rights, Ontario relies exclusively on the Export Clause, which states, "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.
 
 
 9
 Initially, it is apparent that there is no contractual relationship between Ontario and the government. See Perri v. United States, 340 F.3d 1337, 1343 (Fed.Cir.2003). Unlike most substantive rights asserted under Tucker Act jurisdiction, the Export Clause may form the basis for both the second and third categories of claims. First, a claim under the Export Clause is essentially a tax refund case — the plaintiff claims that the government has levied a tax in violation of the Constitution which entitles the plaintiff to a refund of the sum illegally exacted. See City of Alexandria v. United States, 737 F.2d 1022, 1028 (Fed.Cir.1984) (describing a claim for a tax refund as a claim for money illegally exacted); Manassas Park, 633 F.2d at 183; Eastport S.S., 372 F.2d at 1007-08; S. Puerto Rico Sugar Co. Trading Corp. v. United States, 167 Ct.Cl. 236, 334 F.2d 622, 626 (1964). Second, Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed.Cir.2000), held that the Export Clause is money-mandating. In that case, the Court of Federal Claims dismissed Cyprus Amax's claims because it failed to comply with the administrative procedures for obtaining a tax refund. Id. at 1370. The Court of Federal Claims reasoned that this failure precluded Cyprus Amax from seeking a refund under either the Internal Revenue Code or the Export Clause. Id. This court reversed, holding that a plaintiff was not required to comply with the administrative procedures for obtaining a refund under the Internal Revenue Code in order to claim an entitlement to taxes collected in violation of the Export Clause. Id. at 1373. In so doing, the court held that the Export Clause was money-mandating because its restriction on the "taxing power requires Congress to refund money obtained in contravention" of it. Id.
 
 
 10
 While reliance on the Export Clause may establish jurisdiction, the government argues that Ontario's position one-step removed from any government action negates such a finding. We agree. While there are some circumstances under which jurisdiction exists even though the plaintiff did not pay money directly to the government, we do not believe that Ontario's position is analogous. In Aerolineas Argentinas, 77 F.3d 1564, an airline sought reimbursement of costs borne by it for transporting aliens who sought political asylum in the United States. Relying on the fact that the government had not required the airline to pay money directly to it, the Court of Federal Claims dismissed. Id. at 1568. We reversed because the money exacted from the airline was paid "at the direction of the government to meet a governmental obligation." Id. at 1573 (citations omitted). Similarly Camellia Apartments, Inc. v. United States, 167 Ct.Cl. 224, 334 F.2d 667 (1964), held that jurisdiction existed even though the plaintiff had not paid the exacted sums directly to the government. In that case, the Federal Housing Administration required that the plaintiff pay a "prepayment premium charge" to its mortgagees as a precondition to refinance its properties with private lenders. Id. at 669. The mortgagees then transmitted the premium to the Federal Housing Administration. In rejecting the government's motion to dismiss for lack of jurisdiction, we said,
 
 
 11
 The fact that the FHA acted through the mortgagees in requiring the payments of which plaintiffs complain is immaterial; under the pertinent regulation, the mortgagees were required to collect these funds and to remit them to the Commissioner. Therefore, we do not think that defendant can seriously deny plaintiffs' allegation that the mortgagees acted solely as the FHA's agents in so doing.
 
 
 12
 Id. More recently, in Casa De Cambio Comdiv S.A. v. United States, 291 F.3d 1356 (Fed.Cir.2002), the plaintiff ("Casa") alleged that the United States Treasury had illegally exacted money by failing to verify the authenticity of a Treasury check in a timely manner. Casa had deposited the check with its bank, Norwest, which had, in turn, presented the check to Treasury for payment. Id. at 1357-58. After having paid Norwest, Treasury discovered that the check was stolen and recouped the sum from Norwest. Id. Norwest then debited Casa's account. Id. Casa initiated proceedings in the Court of Federal Claims, which the government moved to dismiss for lack of jurisdiction. Id. Relying on Aerolineas Argentinas and Camellia, Casa argued that the indirect relationship between its loss and the government's alleged failure to verify the authenticity of the check was sufficient. Adhering to the test used in Fifth Amendment takings cases, we held that it was not. Id. at 1364. As in Aerolineas Argentinas and Camellia, the government is considered to have illegally exacted money from a plaintiff only where "the government's actions on the intermediate third party have a `direct and substantial' impact on the plaintiff asserting the [illegal exaction] claim." Id. at 1361; see also Turney v. United States, 126 Ct.Cl. 202, 115 F.Supp. 457 (1953) (takings case where the Philippine government acted in concert with the United States to repossess mistakenly sold radar equipment).
 
 
 13
 While the government required the U.S. suppliers to pay the coal excise tax and reclamation fees, it did not command them to pass the tax through to Ontario; nor did Ontario pay the taxes and fees on behalf of the government to satisfy a governmental obligation, see Aerolineas Argentinas, 77 F.3d at 1573; nor did the government's collection of the taxes from the suppliers have a "direct and substantial impact" on Ontario, Casa De Cambio, 291 F.3d at 1361. The U.S. suppliers made an independent decision to include the amount of the taxes and fees in the price of coal sold to Ontario. Therefore, there is no jurisdiction under the Tucker Act based on an illegal exaction.
 
 
 14
 On the same reasoning, it is equally apparent that the Export Clause is not money-mandating with respect to Ontario's claims. In Casa De Cambio, 291 F.3d at 1361, we assumed that the relevant regulations were money-mandating. Nevertheless, we held that jurisdiction was lacking because "the regulations would only apply to claims against the government by Norwest. Casa's theory does not explain how the regulations could be construed as being money-mandating as to Casa, even if they were money-mandating as to Norwest." Id. Ontario's position parallels that of Casa — it is one step removed from any government action. Furthermore, there is simply no indication that the Export Clause was intended to confer rights on parties who have not paid taxes, either directly to, or at the behest of, the government. See id. Therefore, the Export Clause is not money-mandating with respect to Ontario. Because jurisdiction under the Tucker Act is lacking, we need not address standing.
 
 
 Conclusion
 
 
 15
 Accordingly, the judgment of the Court of Federal Claims is affirmed.
 
 
 16
 
 AFFIRMED.